HENRY J. DANE vs. BOARD OF REGISTRARS OF VOTERS OF
CONCORD & others.[1]

Suffolk. April 6, 7, 1977. — January 5, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, & ABRAMS, JJ.

*Domicil. Elections. Practice, Civil,* Parties, Class action. *Jurisdiction,*
Election. *Prisoner.*

Under the provisions of G. L. c. 51, § 48, a registered voter of a town had
standing to resort to judicial proceedings to challenge the registration
of inmates of a prison in the town by the board of registrars of voters.
[157-158]

The Superior Court had jurisdiction under G. L. c. 56, § 59, to review the
inclusion by a town's board of registrars of prison inmates on the
voting list. [158-159]

The fact that certification of a class of defendants was error was not fatal
to appellate review where this court's decision was not dispositive of
the rights of each member of the class. [159-160]

Under the Constitution of the Commonwealth every inmate of a
Massachusetts correctional institution who is a duly qualified, regis-
tered voter in a Massachusetts municipality has the right to vote in
State elections. [160-161]

Although there is a presumption that prisoners, by reason of their involun-
tary presence at the place of incarceration, have retained their former
domicil for voting purposes, prisoners may rebut the presumption by a
showing that they have formed the requisite intent to make the city or
town of the place of their incarceration their domicil. [161-166]

Amendment of the election laws by St. 1973, c. 1137, did not compel the
registrars of voters of a town to accept a prison inmate's claim of domi-
cil in the town solely on the basis of the inmate's affidavit of registra-
tion or prevent the registrars from questioning a prison inmate at the
time of registration with respect to his residence. [166-173]

General Laws c. 51, § 49, places the burden on a registrant who is
challenged to satisfy a board of registrars of voters that he is qualified
to be registered. [174-175]

[1] Approximately 300 inmates of the Massachusetts Correctional Institu-
tion at Concord.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 7, 1976.

On transfer to the Superior Court, the case was heard by *Adams, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Henry J. Dane,* pro se.

*Anne Hoffman* for the inmates of the Massachusetts Correctional Institution at Concord.

*John S. Grace,* for the Secretary of the Commonwealth, amicus curiae, submitted a brief.

QUIRICO, J.   The plaintiff Henry J. Dane, a registered voter in the town of Concord (town), by this action seeks declaratory and injunctive relief against the defendant board of registrars of voters of Concord (registrars). The plaintiff questions the validity of the action of the registrars in accepting affidavits of registration and registering to vote approximately 300 individual defendants (inmates) who were imprisoned at the Massachusetts Correctional Institution at Concord (Concord). The complaint alleges that, because the inmates did not reside voluntarily at Concord, they lacked the intent necessary to establish legal domicil in the town, and therefore were not entitled to register as voters in the town. The plaintiff initially sought before a single justice of this court a declaration as to the rights of the parties, as well as preliminary and permanent injunctions ordering the registrars to strike from the list of qualified voters of the town, and enjoin from further inclusion, those inmates who, at hearings conducted under G.L. c. 51, §§ 48 and 49, introduced no evidence of domicil other than the facts of incarceration within the town and "unsubstantiated declaration[s] of intent" that they considered the town to be their home.

The single justice transferred the case to the Superior Court where a motion to dismiss was denied and the inmates were certified as a class under Mass. R. Civ. P. 23, 365 Mass. 767 (1974). A hearing was held on the plaintiff's motion for summary judgment, and a different judge ruled

that mere presence through incarceration at Concord and the completion of the affidavits of registration did not require the registrars to add the names of the inmates to the town's current annual register of voters. The registrars, however, were not ordered to strike the inmates' names from the list of voters.[2]

The inmates' appeal and the plaintiff's cross-appeal were entered in the Appeals Court. On application, we granted direct appellate review. G. L. c. 211A, § 10 (A). There is before us the memorandum of decision and order for judgment on the plaintiff's motion for summary judgment, together with affidavits, exhibits, and a transcript of a hearing held March 19, 1976, before the registrars.

We summarize the facts: On February 1, 1976, the registrars registered the inmates as voters in the town. Each of the inmates executed an affidavit of registration as prescribed by G. L. c. 51, § 36, listing Concord as his address, and stating that he was a resident of the town and considered such residence to be his home. The registrars did not inquire further of the inmates as to their residence, and added the names of the inmates to the list of voters pursuant to G. L. c. 51, § 46. The failure to inquire further as to residence was apparently due to the registrars' reliance on a memorandum dated January 23, 1976, from the deputy State secretary and director of elections to all city and town clerks and election commissioners concerning the registration and voting of mental patients and inmates of correctional institutions. The memorandum contained, in part, the following advice: "[P]risoners may register to vote in the community in which the prison is located if they swear on the affidavit of registration that they consider that residence to be their home."[3]

---

[2]Subsequent to his order, the judge denied both the inmates' motion for a stay of execution pending appeal and the plaintiff's motion for modification of the order.

[3]The judge's memorandum erroneously quotes the language as coming from a letter to clerks and commissioners from the same official, dated October 23, 1975.

On February 20, 1976, the plaintiff filed a "complaint" with the registrars, in accordance with G. L. c. 51, § 48, alleging that the inmates had been illegally or incorrectly registered because they lacked the intent necessary to establish legal domicil in the town.

The registrars held a hearing on the complaint pursuant to G. L. c. 51, § 49, on March 19, 1976. Each of the nineteen inmates present pursuant to summons[4] was examined and each, on advice of his counsel, refused to answer questions concerning domicil except to identify himself and affirm that he had truthfully completed the affidavit of registration.

On March 23, 1976, the registrars met for the purpose of determining the action to be taken on the plaintiff's complaint. On a motion to strike the examined inmates' names from the list of voters, the registrars voted two in favor and two against. The motion thus failed to carry, and the nineteen inmates' names, as well as those of the other defendant inmates, remained on the town's voting list.

In his memorandum of decision, following a summary of the uncontroverted facts as they appeared in the pleadings, affidavits, and exhibits, the judge found jurisdiction pursuant to G. L. c. 56, § 59, which, he held, gave the court power to enforce the provisions of G. L. c. 51. He considered the question before him to be whether the evidence before the registrars was sufficient as matter of law to warrant their decision, and held the applicable standard of review to be one of "substantial evidence."

The judge cited the previous decisions of this court in *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. 570, 575-576 (1974), and Appeals Court in *Coulombre* v. *Registrars of Voters of Worcester*, 3 Mass. App. Ct. 206, 208 (1975), and ruled that a determination of residency for voting purposes requires a voter to have his domicil in the city or town in which he seeks to register. Quoting our words

---

[4] Apparently twenty-eight inmates were summoned to appear before the registrars, but only nineteen were examined on March 19, 1976.

in *Hershkoff* at 576-577, the judge ruled that "[a] person's domicil is usually the place where he has his home . . . the place where . . . [he] dwells and which is the center of his domestic, social and civil life" (quoting from Restatement [Second] of Conflict of Laws § 12 [1971]) and that "[a] change of domicil takes place when a person with capacity to change his domicil is physically present in a place and intends to make that place his home for the time at least."

Turning to the issue of the defendant inmates' present domicil, the judge relied on the *Coulombre* decision wherein the Appeals Court said that the fact of involuntary presence created a presumption that a person did not gain a new domicil, and that to rebut the presumption required more than the unsubstantiated declarations of an inmate. *Coulombre, supra* at 209. The judge found that the registrars had not recognized such a presumption, but rather had relied solely on the inmates' verification of residence on their voter registration affidavits. Thus, he ruled that the registrars did not properly determine whether the facts before them were sufficient to satisfy the actual presence and intent requirements for establishing domicil.

Although the judge's order was to the effect that the mere presence through incarceration at Concord along with the completion of an affidavit did not require the registrars to add the name of an applicant to the current annual register of voters, he did not order that the names of the inmates be removed from the town's voting list. It is because of this failure to remove the names from the list that the plaintiff appeals.

The appeal by the inmates is based on alleged error of the judge in denying their motion to dismiss on the claimed grounds of the plaintiff's lack of standing and the Superior Court's lack of jurisdiction. The inmates further argue that the affidavits of registration established on their face that the inmates were qualified to vote as residents of the town, and that their names were properly placed and retained on voting lists. We consider these issues below.

1. *Scope of Review.*

As stated, *supra,* the Superior Court judge determined that the question before him was whether the evidence before the registrars was sufficient as matter of law to warrant their decision. The judge stated: "The applicable standard is 'substantial evidence,' or 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" See *Hershkoff, supra* at 574 (1974), quoting from *Boston Edison Co.* v. *Selectmen of Concord,* 355 Mass. 79, 92 (1968). We think it also necessary to review the basis of the decision of the registrars as to the legal standards we think they applied. Inasmuch as the votes of two registrars not to strike the inmates' names from the list of voters of the town may have been based on an incorrect interpretation of the election laws regarding the acceptance of affidavits at the time of registration, we are not bound by the judge's ultimate conclusions.

2. *Standing.*

The plaintiff claims that as a registered voter of the town he has standing to challenge in the Superior Court the registration of the inmates by the registrars and to seek declaratory and injunctive relief. We agree. Although G. L. c. 51, § 48 (as amended by St. 1962, c. 437, § 23), does not specifically provide for judicial action, it allows a complaint to be brought before the registrars by a registered voter if he has reason to believe that a person has been illegally or incorrectly registered. Surely the legislative intent was not to create a mechanism whereby a registered voter may challenge before the registrars a registration he believes to be illegal, and yet be barred from seeking judicial review of a final decision of the registrars adverse to his complaint. Such a scheme would close the avenue for review of registrars' decisions only as to the aggrieved voter, but would leave unobstructed judicial review of decisions where complaint has been brought by the person refused registration. E.g., *Hershkoff, supra.* We thus deem § 48 to confirm implicitly the registered voter's right and special interest to re-

sort to judicial proceedings to enforce compliance by the registrars with the statutory standards of voter eligibility.

The plaintiff claims that another interest is sufficient to give standing to bring suit. He argues that, if persons whom he believes not to be qualified are registered to vote, the weight of his own vote will be reduced or diluted. In this vein, the United States Supreme Court in *Reynolds v. Sims*, 377 U. S. 533 (1964), a case challenging a State apportionment of electoral districts, stated that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. See *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969); *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969); *Baker v. Carr*, 369 U.S. 186, 208 (1962). These cases concerned the protection of citizens' voting interests from dilution by inequitable legislative apportionment. We need not reach the question of their applicability here because we consider the statute dispositive of this aspect of the case.

3. *Jurisdiction.*

The Superior Court has jurisdiction pursuant to G. L. c. 56, § 59, to review the registrars' inclusion of the inmates' names on the voting list. General Laws c. 56, § 59 (as appearing in St. 1946, c. 537, § 11), provides that "[t]he supreme judicial and superior courts shall have jurisdiction at law, in equity or by mandamus to enforce the provisions of . . . [c. 50 to c. 56], inclusive." As we stated in *McCarthy v. Secretary of the Commonwealth*, 371 Mass. 667, 676-677 (1977), the Superior Court has broad power to enforce the election laws pursuant to G. L. c. 56, § 59. It is apparent from the pleadings, affidavits, exhibits, and briefs of the parties, that the plaintiff in effect sought in the Superior Court the enforcement of c. 51, §§ 47, 47A, 47B, 48, and 49, and that he likewise seeks such enforcement here.[5]

---

[5] Cf. *Attorney Gen.* v. *Aldermen of Everett*, 351 Mass. 193, 196-197 (1966), wherein we held that a claim seeking to have an election declared void was not "directed to the enforcement" of a specific provision of the election code.

As this court recently concluded, "[t]he legislative concern for safeguarding the electoral process from fraud, negligence, or other systemic malfunction is evident throughout the State election laws." *McCarthy, supra* at 679. In light of such concern, the Legislature assuredly did not intend to leave the question whether an individual is illegally or incorrectly registered to the sole unreviewable discretion of the local registrars. *McCarthy, supra.* Inasmuch as this court reviewed and reversed decisions of a board of registrars in *Hershkoff, supra,* where complaint was brought by persons *refused* registration and the Appeals Court took similar action in *Coulombre* v. *Registrars of Voters of Worcester,* 3 Mass. App. Ct. 206 (1975), we consider G. L. c. 56, § 59, to be an appropriate provision for review of the registrars' action by the Superior Court.[6]

4. *Certification of the Class.*

As noted early in this opinion, the plaintiff's motion to determine the propriety of a class action was allowed and the 300 defendant inmates were certified as a class.[7] The inmates do not here challenge such certification. However, we note that the motion for class certification was based on certain allegations of the plaintiff's amended complaint,[8] which, although appearing on their face to satisfy the prerequisites of Mass. R. Civ. P. 23 (a) and (b), 365 Mass. 767

---

[6] Cf. *McCarthy* v. *Secretary of the Commonwealth,* 371 Mass. 667, 690 (1977) (Quirico, J., dissenting).

[7] See note 2 *supra.*

[8] The plaintiff's amendment to the complaint reads in part as follows: "The plaintiff brings this action against the . . . [Registrars], the Registrants, and all other persons who have registered to vote in the Town . . . while incarcerated at . . . Concord who are similarly situated to the Registrants (hereinafter referred to as the 'Class'). The Class numbers approximately three hundred and it is impracticable to bring all of said Class before the Court; there are questions of law or fact presented herein which are common to the entire Class; the defenses of the Registrants are typical of the defenses of the said Class; the Registrants will fairly and adequately protect the interests of the said Class; the questions of law or fact common to the members of the Class predominate over the questions affecting only individual members; and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

(1974), regarding class actions, do not on closer examination comply. We believe that there are particular questions of fact concerning each inmate's domicil, and that those questions of law and fact common to all the inmates do not predominate so as to warrant certification of the inmates as a class.[9]

However, any deficiency in the certification of the class is not presently fatal to appellate review in this case since our decision today is not dispositive of the rights of the 300 inmates to register to vote in the town. Consequently the defect in the certification of the inmates as a class is harmless.

5. *Registration of the Inmates.*

(a) *The right of prisoners to vote in Massachusetts.* The Constitution of the Commonwealth begins with a Declaration of Rights, the first article of which provides in part that "[a]ll men are born free and equal, and have certain natural, essential, and unalienable rights." In *Attorney Gen. v. Suffolk County Apportionment Comm'rs,* 224 Mass. 598 (1916), this court held that among the "rights" secured by art. 1 is the right to vote. The court stated: "The right to vote is a fundamental personal and political right. The equal right of all qualified to elect officers is one of the securities of the Declaration of Rights, arts. 1-9." *Id.* at 601.

The basic constitutional *qualifications* for voters in this Commonwealth are that they be citizens of "eighteen years of age and upwards, excepting persons under guardianship and persons temporarily or permanently disqualified by law because of corrupt practices in respect to elections who shall have resided within the town or district in which [they] may claim a right to vote, six calendar months next preceding any election." (Art. 3 of the Amendments, as most recently amended by art. 40, approved November 5, 1912; arts. 93 and 94, approved November 3, 1970; and arts. 95 and 100, approved November 7, 1972.) General Laws c. 51, § 1, as amended through St. 1975, c. 275, essentially codifies these constitutional qualifications.[10]

---

[9] See Mass. R. Civ. P. 23 (a) (2) and (b).

[10] General Laws c. 51, § 1, as amended through St. 1975, c. 275, provides in pertinent part as follows: "[E]very citizen eighteen years of age

Disfranchisement of convicted criminals by State law was held by the United States Supreme Court in *Richardson v. Ramirez*, 418 U.S. 24 (1974), not to violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. While many other jurisdictions deprive prisoners of the voting franchise, it is clear from the above cited constitutional and statutory provisions that Massachusetts does not do so.[11] Each inmate of a Massachusetts correctional institution who is a duly qualified, registered voter in a Massachusetts municipality has the right under the Constitution of the Commonwealth to vote in State elections.

(b) *Domicil of prisoners for voting purposes.* The word "resided," as it appears in the constitutional and statutory provisions above relating to voter qualification, has long been construed to require that the voter have his "domicil" in the appropriate city or town. *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. 570, 576 (1974). See *Opinion of the Justices*, 365 Mass. 661 (1974); *Opinion of the Justices*, 5 Met. 587, 588 (1843); *Putnam* v. *Johnson*, 10 Mass. 488, 501 (1813), and cases therein cited. "Every person must have a domicil, and he can have only one domicil at a time, at least for the same purpose. See *Abington* v. *North Bridgewater*, 23 Pick. 170, 177 (1839); *Opinion of the Justices*, 5 Met. 587, 589 (1843); Restatement 2d: Conflict of Laws § 11 (1971). 'A person's domicil is usually the place

or older, not being a person under guardianship and not being temporarily or permanently disqualified by law because of corrupt practices in respect to elections, who is a resident in the city or town where he claims the right to vote at the time he registers, and who has complied with the requirements of this chapter, may have his name entered on the list of voters in such city or town, and may vote therein in any such election. . . . No person otherwise qualified to vote for national or state officers shall, by reason of a change of residence within the commonwealth, be disqualified from voting for such officers in the city or town from which he has removed his residence until the expiration of six months from such removal."

[11] See Note, Restoring the Ex-Offender's Right to Vote: Background and Developments, 11 Am. Crim. L. Rev. 721, at 758-770 (1973), for tables of State disfranchisement provisions concerning persons presently incarcerated as well as ex-offenders.

where he has his home.' *Id.* at comment a. 'Home is the place where a person dwells and which is the center of his domestic, social and civil life.' *Id.* at § 12. See *Mellon Natl. Bank & Trust Co.* v. *Commissioner of Corps. & Taxn.* 327 Mass. 631, 638 (1951). A change of domicil takes place when a person with capacity to change his domicil is physically present in a place and intends to make that place his home for the time at least; 'the fact and intent must concur.' *Opinion of the Justices,* 5 Met. 587, 589 (1843). Restatement 2d: Conflict of Laws, §§ 15-18 (1971)." *Hershkoff, supra* at 576-577.

The judge found that each of the inmates had a domicil prior to his incarceration at Concord. As to those inmates who were domiciled in the town at the time of sentencing, there is no controversy before us. The fact of their incarceration at Concord does not strip them of their previous acquisition of domicil within the town. The issue with which we are presently faced, however, is whether a person domiciled in one place and who is then sentenced to a correctional institution in another city or town has the capacity to acquire a new domicil for voting purposes in the place of his incarceration.

Domicil once acquired is not lost until a new one is obtained, *White* v. *Stowell,* 229 Mass. 594, 597 (1918), and the original domicil is presumed to have continued in the absence of compelling evidence that it was changed. *Commonwealth* v. *Davis,* 284 Mass. 41, 49 (1933). It has been the general rule in other jurisdictions that inmates of penal institutions cannot acquire a domicil of choice in the place of their imprisonment when they are there by virtue of legal compulsion. *Stifel* v. *Hopkins,* 477 F.2d 1116, 1121 (6th Cir. 1973). See *Cohen* v. *United States,* 297 F.2d 760, 774 (9th Cir.), cert. denied, 369 U.S. 865 (1962); *United States* v. *Stabler,* 169 F.2d 995, 998 (3d Cir. 1948); *United States* v. *Gronich,* 211 F. 548, 550 (W.D. Wash. 1914); *Polakoff* v. *Henderson,* 370 F. Supp. 690, 693 (N.D. Ga. 1973), aff'd per curiam, 488 F.2d 977 (5th Cir. 1974); *Dreyer* v. *Jalet,* 349 F. Supp. 452, 465 (S.D. Tex. 1972), aff'd per curiam,

479 F.2d 1044 (5th Cir. 1973); *Urbano* v. *News Syndicate Co.*, 232 F. Supp. 237, 239 n.1 (S.D.N.Y. 1964), rev'd on other grounds, 358 F.2d 145 (2d Cir.), cert. denied, 385 U.S. 831 (1966); *Shaffer* v. *Tepper*, 127 F. Supp. 892, 894-895 (E.D. Ky. 1955).[12] It has been stated on the subject that "[r]esidence in a place by constraint, or involuntarily, will not give the party a domicil there; but his antecedent domicil remains." Hogan, Joseph Story's Essay on "Domicil," 35 B.U.L. Rev. 215, 221 (1955). And, Restatement (Second) of Conflict of Laws § 17 (1971) provides: "A person does not acquire a domicil of choice by his presence in a place under physical or legal compulsion."[13] Section 17, Comment c, of the Restatement (Second) further provides: "Under the rule of this Section, it is impossible for a person to acquire a domicil in the jail in which he is incarcerated. To enter jail, one must first be legally committed and thereby lose all power of choice over the place of one's abode."[14]

However, this court has determined that certain other classes of individuals, who are subject to a similar type of "compulsion" to stay, may be able to show a change of domicil from their former residence to the place of their *enforced* presence. In *Mooar* v. *Harvey*, 128 Mass. 219,

---

[12] See also *Hillman* v. *Stults*, 263 Cal. App. 2d 848, 872 (1968); *Bull* v. *Kistner*, 257 Iowa 968, 971-972 (1965); *Ferguson's Adm'r* v. *Ferguson's Adm'r*, 255 Ky. 230 (1934); *People* v. *Cady*, 143 N.Y. 100 (1894). Cf. *Agnew* v. *Platt*, 15 Pick. 417, 420-421 (1834).

[13] See 1 J.H. Beale, Conflict of Laws 154-160 (1935); H.F. Goodrich, Conflict of Laws 45-46 (4th ed. 1964).

[14] In Pennsylvania and Vermont, although prisoners can vote they cannot acquire a domicil for voting purposes in the place of imprisonment. See *Commonwealth ex rel. Walden* v. *Brown (No. 2)*, 85 Pa. D. & C. 581 (C.P. of Dauphin County 1953). Vermont, by statute, provides: "Notwithstanding any other provision of law, a person who is convicted of a crime shall retain the right to vote by absentee ballot in a primary or general election at his last voluntary residence during the term of his commitment under a sentence of confinement provided the person otherwise fulfills all voting requirements. No person sentenced to the custody of the commissioner of corrections may use the place of involuntary confinement as his place of residence for the purpose of qualifying to vote." Vt. Stat. Ann. tit. 28, § 807 (1977).

220-221 (1880), this court found a soldier to have changed his domicil while in the military service. Rather than precluding the soldier from establishing a domicil different from the one he had before entering the service, the court examined the serviceman's "intent" as to domicil. That intent, as evidenced by outward indicia of domicil, i.e., place of daily residence, payment of taxes or lack thereof, and exercise of the voting privilege, was found to be the intent to change his domicil to the place of his service commitment.[15]

In *Hershkoff* v. *Registrars of Voters of Worcester,* 366 Mass. 570 (1974), we held that students who are required to live in a particular place because of the location of the institution in which they are enrolled can acquire a domicil there for voting purposes. We held that on the evidence presented by the plaintiff students as to their residence in Worcester, their relationship with the city, and their intent to make Worcester their home for the time at least, the registrars of voters were wrong in concluding that the students were not domiciled in Worcester and therefore disqualified from voting by reason of domicil elsewhere. *Id.* at 580.

In *Coulombre* v. *Registrars of Voters of Worcester,* 3 Mass. App. Ct. 206 (1975), the plaintiff, a patient at the Worcester State Hospital, had been refused registration by the registrars of voters because they considered him not to be a resident of Worcester for voting purposes. He was not living at the Worcester State Hospital of his own volition but rather as a condition of probation. He was employed in Worcester and maintained a bank account there. Even though his only basis for living in Worcester was to comply with the terms of probation and earn enough money to

---

[15] See *Carrington* v. *Rash,* 380 U.S. 89 (1965), where the United States Supreme Court held a State cannot deny the ballot to a bona fide resident merely because he is a member of the armed services. The Court stated: "[T]he fact that one is a solider or sailor does not deprive him of the right to change his residence or domicile and acquire a new one." *Id.* at 96, quoting from *Robinson* v. *Robinson,* 235 S.W.2d 228, 230 (Tex. Civ. App. 1950). See Restatement (Second) of Conflict of Laws § 17, Comment d (1971).

leave, the Appeals Court noted that, although the plaintiff intended to leave eventually, he nevertheless intended to make his home in Worcester "for the time at least" and held that he met the actual presence and intent requirements to establish domicil. *Id.* at 208, quoting from *Hershkoff, supra* at 577.

The Appeals Court in the *Coulombre* case, and the trial judge in the instant case, looked to the decision in *Stifel* v. *Hopkins,* 477 F.2d 1116 (6th Cir. 1973), a case which involved the question whether a Federal prisoner could acquire a domicil in the State of his incarceration for the purpose of Federal diversity jurisdiction. In concluding that he could, the court in the *Stifel* case stated: "We recognize the importance of considering physical or legal compulsion in determining whether domicile is gained or lost, but we limit the application of involuntary presence to its operation as a presumption ordinarily requiring more than unsubstantiated declarations to rebut." *Id.* at 1126. See the *Coulombre* case, *supra* at 209, and *Jones* v. *Hadican,* 552 F.2d 249, 251 (8th Cir. 1977).

Relying on the *Stifel* decision as a precedent, the Appeals Court held in the *Coulombre* case that, where the plaintiff, in addition to his statement of intent, had worked in Worcester and otherwise engaged in community activity, he had rebutted the presumption against the acquiring of a new domicil and satisfied the residency requirements of G. L. c. 51, § 1.

We believe that the reasoning applied in the *Stifel* and *Coulombre* cases applies to the present case. We think that prisoners, like servicemen or students, should be able to "rebut" the presumption that by reason of their involuntary presence at the place of incarceration they have retained their former domicil. We here recognize the capability of those imprisoned in Massachusetts correctional institutions to form the requisite intent to make the city or town of the place of their incarceration their domicil for voting purposes. We think the capacity of prisoners thus to change

their domicil for voting purposes "is implicit in [their] eligibility to vote." *Hershkoff, supra* at 578.

(c) *Proof of domicil.* The inmates, as well as the Secretary of the Commonwealth,[16] argue that as a result of St. 1973, c. 1137, amending several sections of G. L. c. 51, the registrars were (a) compelled to accept the inmates' claim of domicil in the town solely on the basis of their completion of affidavits of registration, and (b) prevented at the time of registration from making inquiry into the validity of the inmates' assertions as to domicil. We disagree.

Prior to the extensive amendments to G. L. c. 51, accomplished by St. 1973, c. 1137, the pertinent provisions governing the registration of voters included the following provisions. A person desiring to register was required to "apply in person to the registrars for registration and prove that he is qualified." § 42. There were special provisions for persons under physical disability. § 42A. The registrars were required to "examine on oath each applicant for registration . . . relative to his qualifications for voting." § 44. If the registrars were satisfied that the applicant was qualified, they placed his name on the register of voters, § 46; otherwise they informed him of his rejection, § 47.

After the amendments accomplished by St. 1973, c. 1137, the pertinent provisions were substantially as follows. "Registration as a voter shall be by affidavit of registration . . . ." § 42. The form of the prescribed affidavit is adequate in the ordinary case to permit the applicant to record all the information necessary to enable the registrars to determine whether the applicant is eligible to register, assuming the entries thereon to be accurate and truthful. § 36. The affidavit must be signed by the applicant "under the pains and penalties of perjury in the presence of a registrar, assistant registrar, or absent registration officer." § 44. The language formerly appearing in § 44, that the registrar "shall examine on oath each applicant for registration," does not appear in any section after the 1973 amendments.

---

[16] The Secretary of the Commonwealth filed a brief as amicus curiae.

"Upon receipt of a completed affidavit of registration, the registrars shall, except as provided in [§ 47], place said affidavit in their files and add the name of the voter to the current annual register of voters in the city or town." § 46. "If, after examination of an affidavit of registration, it appears to the registrars from the facts set forth in the affidavit that the person is not qualified to be registered as a voter or that the affidavit is incomplete, they may decline to enter his name on the annual register[,] . . . shall notify . . . [him] and give him a reasonable opportunity to remedy the defects in his affidavit. If the registrars are still not satisfied that the affidavit meets the requirements of this chapter, they shall not accept it and shall forthwith inform the person thereof." § 47. "If at any time subsequent to the registration of a voter the registrars have probable cause to believe that the voter has made a false statement in his affidavit of registration, they may prepare a complaint setting forth the basis for their belief, and summon the voter to appear before them . . . . They shall examine the voter and determine his qualifications to vote . . . ." § 47B.

The procedures for the filing of a complaint by a voter and for a hearing thereon are prescribed by G. L. c. 51, §§ 48 and 49, as amended by St. 1962, c. 437, §§ 23 and 24, respectively.[17] Section 48 provides that a complaint may be filed with the registrars by any registered voter who believes a certain person has been illegally or incorrectly registered. It also provides that the registrars shall summon the person complained of to appear before them to answer the complaint. Section 49 provides that the registrars shall examine the person complained of under oath as to his qualifications as a voter. If the registrars determine that he is qualified they must make and enter a statement of their determination of the facts required for registration, and if they are satisfied that he does not have the qualifications they must strike his name from the register.

---

[17] Sections 48 and 49 were not amended by St. 1973, c. 1137.

While G. L. c. 51, §§ 47B, 48, and 49, expressly authorize the questioning of a voter *subsequent* to his registration, we do not construe that as precluding such questioning as to his qualifications at the time of registration in a case such as the present where the address given on the applicant's affidavit indicates that it is the address of a correctional institution. In such circumstances the registrars have the right and the duty to satisfy themselves that the prisoner has acquired a voting domicil at the institution despite the fact that he did not originally choose or volunteer to be committed therein.

The inmates and the Secretary of the Commonwealth seem to urge, on the other hand, that the legislative intent behind the whole of St. 1973, c. 1137, was to preclude the registrars from making inquiry as to claims of domicil on the face of affidavits until a *post-registration* evidentiary hearing was convened pursuant to G. L. c. 51, §§ 47B, 48, and 49. Whereas in *Hershkoff* v. *Registrars of Voters of Worcester,* 366 Mass. 570, 579 (1974), we deemed proper those questions asked by registrars *at the time of registration* concerning prior voting restrictions, automobile registrations, automobile insurance, past and current addresses, locale of payment of taxes, drivers' licenses, parents' residences, and future plans, the inmates and the Secretary of the Commonwealth argue that such holding was based on c. 51 as appearing prior to the 1973 amendments, and that the legislative history of the amendments would not now support the same conclusion.

We think, however, that the legislative history of St. 1973, c. 1137, sheds little light on this matter. 1973 House Bill No. 7752, as amended — a bill providing for uniform procedures for voter registration — was the final version of St. 1973, c. 1137. The bill was based on three 1973 separate House Bills, Nos. 1689, 3279, and 5643. House Bill No. 3279 contained the closest embodiment of House Bill 7752 as finally passed. Indications as to the intent of the Legislature in passing House Bill No. 7552 could perhaps be gleaned from the provisions of House Bills Nos. 1689 and 5643, which were excluded from House Bill

No. 7752 as finally passed. House Bill No. 1689 proposed to amend G. L. c. 51, § 1, to provide that a registrar was to request only a person's name, age, address, and citizenship status before entering the person's name on the list of voters. If the registrar had reason to believe that such information was not or may not have been true, the registrar could then request the person to sign a certification under the pains and penalties of perjury that the information given was true. This provision did not appear in House Bill No. 7752. Rather, the final bill provided that *all* information on an applicant's affidavit be verified under the pains and penalties of perjury. House Bill No. 5643 — a bill providing for standard questions to be used by boards of registrars of voters — sought to amend G. L. c. 51, § 44, by adding a requirement that the registrars ask each applicant the twelve questions which are reproduced in the footnote below.[18] The questions were not, however, included in House Bill No. 7752 as it came out of committee or as enacted. It may be argued that the failure to include the questions indicates a legislative intent that only the *affidavits* of applicants were to be examined at the time of registration, and that the questioning of the applicants themselves was not to take place. We think, however, that such an interpretation fails in light of G. L. c. 51, § 47, which, as noted, *supra,* provides that registrars may refuse to register an applicant at registration who, from the facts appearing on his affidavit, does not seem qualified. There is nothing in any of the election statutes, as amended by St. 1973, c. 1137, to indicate

---

[18] "Registrars, or absent registration officers, in examining each applicant, shall ask at least the following questions: 1. What is your date of birth? 2. Are you a United States citizen? 3. What is your present address? 4. How long have you lived at that address? 5. At what other addresses, if any, have you lived in this city or town and during what periods? 6. How long have you lived in this city or town? 7. Do you regard this city or town as your home? 8. Is there any other place which you regard as your home? 9. Have you voted or registered to vote in any other place during the last six months? 10. Have you voted or registered to vote in any other place during the last two years? 11. If so, do you have any present intention to vote there again? 12. What is your occupation?"

that, when the address on an applicant's affidavit for registration alerts the registrar to the fact that the applicant is a prisoner serving a sentence in a correctional institution, the registrar is compelled, in effect, to "rubber stamp" the application and register the applicant without further inquiry. The Legislature cannot be assumed to have intended that the several thousand prisoners be registered in the cities and towns where they are imprisoned, and that, if the registrars have any doubts as to the domicils of the prisoners, the question be settled later — possibly after they have voted.

A perusal of recent (1964-1973) legislative reports, some prepared by the Legislative Research Council on the subject of voter registration, is scarcely more enlightening as to the legislative intent behind St. 1973, c. 1137. It was noted, however, in a January 22, 1973, Legislative Research Council Report Relative to Voter Identification, that one of the statutory inadequacies of Massachusetts election laws was that "local registrars must rely on the information given by the applicant. . . . Unless more information than now required was obtained no one except the individual [applicant] would know that he or she [was] registered in two places." [19] In view of such a pronouncement as to the inadequacy of the registration inquiry process under G. L. c. 51 *prior* to its 1973 amendment, it is hard to imagine that the Legislature intended in St. 1973, c. 1137, to add to the inadequacy by *prohibiting* the questioning of applicants at the registration stage. If, indeed, election laws "have historically been geared to insure purity in elections," [20] to ascribe a legislative intent to St. 1973, c. 1137, of prohibiting the questioning of voter applicants at registration, and placing complete reliance on the written affidavits of registration, would be to conclude that the Massachusetts Legislature has chosen to flout the historic ideal. [21] We do not ascribe such an intent to the Legislature.

[19] Legislative Research Council Report Relative to Voter Identification (January 22, 1973), 1973 House Bill No. 5970, at 49.

[20] *Id.* at 37.

[21] But cf. Gleason & Betcher, State and Local Government, 1975 Ann. Survey Mass. Law § 10.5 at 194, wherein a passage of our decision in

Although we recognized earlier in this opinion that prisoners have the capability to form the requisite intent to make the city or town of the place of incarceration their domicil, we also recognize the operation of involuntary presence as creating a "presumption" of failure to acquire a new domicil, "requiring more than unsubstantiated declarations to rebut." *Stifel* v. *Hopkins,* 477 F.2d 1116, 1126 (6th Cir. 1973). *Coulombre* v. *Registrars of Voters of Worcester,* 3 Mass. App. Ct. 206, 209 (1975). The judge found, and we agree, that in this case the registrars, in accepting the affidavits of registration and in registering the inmates without questioning them further as to domicil, did not recognize such a presumption. Rather, they seem to have relied entirely on the advice given them by the deputy State secretary and director of elections that "[p]risoners may register to vote in the community in which the prison is located if they swear on the affidavit of registration that they consider that residence to be their home." [22] The import of the deputy secretary's advice was that registrars should not conduct inquiry of the applicants except as to verification of their affidavits. The deputy secretary additionally filed an affidavit which contains the following statement: "St. 1973, c. 1137, Sec. 5 changed prior law by requiring the applicant for registration to swear under the pains and penalties of perjury that all statements contained

---

*Hershkoff* at 580 is quoted: "When a student of voting age declared that he intended to make Worcester his home, we do not think the registrars were required to take an adversary position as to his intention solely because he was a student." Following the quotation, the Annual Survey notes: "Rejection of this bureaucratic miserliness is consistent with a later legislative requirement that registrars place a new voter's name on the rolls if he files an affidavit satisfying the conditions for eligiblity. . . . [Citing G. L. c. 51, § 42.] Only later, if registrars 'have probable cause to believe that the voter has made a false statement,' may they summon him to appear for examination." [Citing G. L. c. 51, § 47B.] The Annual Survey's comment seems to imply that pursuant to G. L. c. 51, §§ 42 and 47B, as in effect pursuant to St. 1973, c. 1137, questioning of an applicant at the registration stage is barred.

[22] See note 3 *supra.*

in the affidavit are true. These changes in procedure fore-close further inquiry by the registrars of the applicant at the time of registration, including inquiry into any residence or domicile issue, unless the registrars reject the affidavit pur-suant to G. L. c. 51, Sec. 47, or conduct a hearing upon a complaint filed pursuant to Secs. 48 and 49." Pursuant to our reasoning above, however, we think the deputy secre-tary's interpretation of St. 1973, c. 1137, incorrect as matter of law. In order to have any grounds for "rejecting" an af-fidavit pursuant to G. L. c. 51, § 47, on the basis of lack of the required residence or domicil, the registrars must *first* conduct inquiry on that subject if they suspect that an appli-cant may not be qualified for registration in that regard.

On the presentation by the inmates of their affidavits con-taining bare statements that they considered their residence at the Concord correctional institution "to be their home" (i.e., domicil), the registrars were entitled to inquire further as to facts which would substantiate the inmates' declara-tions. We agree with the decision and judgment of the judge below that "mere presence through incarceration at . . . [Concord] and the completion of the affidavit of registra-tion in a manner which, except for the statement of resi-dence . . . [in the town], sets forth facts qualifying the applicant to be registered as a voter, does not require the registrars to add the name[s] of the applicant[s] to the cur-rent annual register of voters in the town." Prisoners may properly be questioned by the registrars at the time of regis-tration as to their past addresses, prior voter registrations, employment (work-release programs, etc.), drivers' licen-ses, registration of automobiles, bank accounts, payment of taxes, future plans, and as to any other facts evidencing their attachment to the community and their desire and in-tent to remain. Any interpretation of the statutes in ques-tion which would prohibit such questioning by the regis-trars, and thus compel prisoners of suspect domicil never-theless to be registered to vote for the election of town of-ficials and on other questions coming before town meetings, could have far-reaching effect on those towns of the Com-

monwealth in which correctional institutions are located. General Laws c. 51, § 26, as amended through St. 1975, c. 600, § 1, permits such registration to continue up to the twentieth day preceding the annual town meeting. Any subsequent questioning of such prisoners by the registrars at hearings held pursuant to G. L. c. 51, §§ 48 and 49, could, due to administrative delay or other reason, well take place *after* a local election or town meeting has been held and the prisoners' votes counted. If the large numbers of inmates at certain correctional institutions were allowed to register to vote without permitting further inquiry as to domicil at the time of registration, any delay in conducting hearings pursuant to G. L. c. 51, §§ 48 and 49, could result in town elections being dominated or at least greatly influenced by the inmates of institutions located in the town.[23] We do not think the legislative intent behind St. 1973, c. 1137, was to create such a burden, and we do not interpret the statute in a manner which would accomplish or permit such a result.

Inasmuch as we have concluded that the registrars relied on an incorrect conclusion of law in not questioning the inmates at the time of registration, we hold that the registration session at Concord was improperly conducted and the registration of the 300 inmates was without force and effect. As such, we order that the names of the 300 inmates be struck from the register of voters. The registrars are to conduct another registration session at Concord, at which time on presentation of the affidavits of inmates, the registrars *may* inquire as to those factors of "presence" within the town and "intent" to remain which substantiate claims of domicil. Factors as to each inmate's domicil shall be considered separately as to each applicant.

---

[23] On November 30, 1977, the population of the major Massachusetts correctional institutions was as follows: M.C.I. Concord, 266; M.C.I. Norfolk, 728; M.C.I. Walpole, 675; M.C.I. Framingham, 87; M.C.I. Plymouth, 49; Southeastern Correctional Center, 221. See Daily Count, Department of Correction, November 30, 1977. (These figures do not take into account the numbers of prisoners housed in the county houses of correction, the minimum security and mental health facilities, as well as the correctional half-way houses and pre-release centers.)

6. *Failure to Strike the Nineteen Inmates' Names After Hearing Pursuant to G. L. c. 51, §§ 48 and 49.*

The plaintiff contends that the judge erred in not ordering the registrars to strike the names of the nineteen inmates from the register of voters, after those nineteen failed to present evidence of domicil when examined at hearings conducted subsequent to registration and pursuant to G. L. c. 51, §§ 48 and 49. Although our decision today does not rest on that contention, we nevertheless express our opinion as to its merits.

In view of our decision as to the initial improper registration of all 300 inmates by the registrars, we think the subsequent decision not to strike the nineteen examined inmates' names from the list of voters was sufficiently "tainted" by legally incorrect assumptions as to invalidate it. As the vote of the registrars on the motion to strike the inmates' names was two in favor and two against, the motion thus failed to carry. It is reasonable to assume that the two votes against the striking of the inmates' names were, in part, influenced by the registrars' previous decision to register them, such registration being improper as heretofore detailed.

However, even if we were not to hold the initial registration of the 300 inmates improper, we would still hold that the judge erred in not ordering the registrars to strike the names of the nineteen inmates who appeared before them and who refused to answer any questions as to domicil. We agree with the plaintiff's argument that G. L. c. 51, § 49, indicates that once a registrant is challenged, the burden is on him to satisfy the registrars that he is properly registered. The registrars had the right to question the nineteen inmates in order to determine whether they were properly registered as qualified voters, with particular reference to whether they intended to make the town their domicil, their home for the time at least. See *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. 570, 578 (1974). The questions asked by the registrars as to prior residence, length of incarceration at Concord, prior voter registration, employment and business transacted in the town, marital status, name and

address of spouse and names of children, driver's license, tax returns, ownership of property, eligibility for parole, United States citizenship, and future plans on release from prison were all geared to elicit such evidence. Counsel for the nineteen inmates objected to all such questions, contending that the only information required to be provided by her clients was that contained in the registration affidavits which they had filed, and as to each such question put by the registrars she either advised or directed her inmate clients not to answer, and they did not answer any of the questions.

We hold that the registrars had the right and duty to hold the hearing required by G. L. c. 51, §§ 48 and 49, that the questions put by the registrars to each of the nineteen inmates were proper, that the inmates had no privilege or right to refuse to answer the questions, notwithstanding the advice or direction of their counsel to the contrary, and that the registrars were not compelled or required to continue the names of the inmates on the register of voters after they wrongfully refused to answer the questions put to them.

7. *Disposition.*

In accord with our reasoning, the judgment of the Superior Court is affirmed in so far as it holds that mere presence through incarceration at Concord, along with the completion of an affidavit, did not require the registrars to add the names of the inmates to the current annual register of voters of the town. In addition, we order judgment to enter declaring the initial registration of the 300 inmates improper, striking their names from the register of voters of the town, and instructing the registrars to hold another registration session at Concord at which they may inquire of inmates applying to vote as to facts substantiating their claims of domicil.

*So ordered.*