KENNETH DOTSON *vs.* COMMISSIONER OF REVENUE.

No. 10-P-2181.

Suffolk. October 11, 2011. - August 29, 2012.

Present: BERRY, COHEN, & SIKORA, JJ.

*Domicil. Taxation,* Income tax.

Substantial evidence supported a finding of the Appellate Tax Board that a
    taxpayer was a domiciliary of the Commonwealth at the time of realization
    of certain stock proceeds, where the Commissioner of Revenue carried her
    burden of proof of demonstrating that the taxpayer, as of August, 1998,
    intended to remain indefinitely in Massachusetts and lacked any certain
    purpose to return to Florida; and where the taxpayer's evidence failed to
    demonstrate that he had changed his domicil back to Florida as of January,
    1999, the date of his realization of the disputed income. [382-387]

APPEAL from a decision of the Appellate Tax Board.

*J. Thomas Price* for the taxpayer.

*Christine Baily*, Assistant Attorney General, for Commissioner of Revenue.

SIKORA, J. Kenneth Dotson, the taxpayer, appeals from a decision of the Appellate Tax Board (board) affirming the denial by the Commissioner of Revenue (commissioner) of an abatement of personal income taxes for the tax year ending on December 31, 1999. G. L. c. 58A, § 13. On January 22, 1999, Dotson exercised certain options for the purchase of stock in the Amazon.com corporation (Amazon) and achieved a gain of $5,317,145.35 for its immediate sale (disputed income). The commissioner determined him to be a domiciliary of the Commonwealth at the time of realization of the stock proceeds, and assessed resulting income taxes in the amount of $320,294 plus interest. On appeal, the board conducted an evidentiary hearing and found Dotson to be domiciled in Massachusetts at the time of his receipt of the disputed income. For the following reasons, we

conclude that substantial evidence supports the board's finding of domicil and therefore affirm the decision denying the requested abatement.

*Background.* 1. *Facts.* The following facts emerged from the evidence at the board as undisputed or as well supported. We defer certain contested points to our analysis of the parties' arguments.

Kenneth Dotson grew up in Tennessee and earned a bachelor's degree, and in 1983 a master's degree in business administration, at the University of Mississippi. During his early career he engaged in financial planning and market analysis. He worked for approximately two years in Tennessee (1983-1985), a year in Florida, and then four years in Connecticut (1986-1990). He returned to Florida, held a series of one-year positions, and in 1994 joined with a local entrepreneur to found a company engaged in the marketing of sports information, entertainment, and merchandise through the Internet. Dotson served from January, 1994, until August, 1998, as the company's vice-president of marketing. CBS (Columbia Broadcasting System) meanwhile acquired the company, then known as "SportsLine.com" (SportsLine).

In late 1997 or early 1998, a Cambridge-based high technology firm contacted him to explore employment. In June, 1998, the company, Sage Enterprises, Inc., doing business as Planet-All (PlanetAll), offered him the position of senior vice-president of marketing and business development. PlanetAll forwarded a written offer on July 1, 1998; Dotson executed a written acceptance on July 2. In addition to base salary and bonus opportunities, the terms of employment included options for 337,290 shares of PlanetAll's privately held stock, scheduled to vest over a four-year period and authorized to vest in one year in the event of the acquisition of PlanetAll by another company. The employment contract set a commencement date of August 17, 1998.[1]

---

[1]The board described PlanetAll as a "technology company in the process of developing a web-based product to allow users to synchronize their contact information and calendars." This description follows Dotson's testimony on direct examination:

*Q*: "Well, . . . what did PlanetAll do?"

Also during July of 1998, PlanetAll informed Dotson that the Internet marketing company Amazon was about to acquire PlanetAll. That news disappointed him. He preferred the culture of a smaller, private start-up firm. Amazon was a large, publicly held company. More specifically, he had observed that Amazon had often acquired and relocated start-up companies to its Seattle headquarters, replaced their management teams, and folded them into the larger Amazon management structure. He feared that it would follow that course with PlanetAll. Nor did he want to move to Seattle and become more remote from family and friends in Florida and Tennessee. On or about July 31 he withdrew his acceptance of the PlanetAll position.

Within a few days, the chief executive officer of Amazon telephoned Dotson to report that PlanetAll would remain intact in Cambridge with its existing management personnel. He urged Dotson to stay and offered him options for 18,810 shares of Amazon common stock in place of the PlanetAll shares. Most importantly he represented that, if Amazon were to move Planet-All to Seattle, Dotson would be free to resign and to exercise his Amazon stock options immediately (by accelerated vesting rather than after a usual span of four years of employment). Amazon forwarded a written offer of employment on August 3; Dotson immediately signed it. He would still occupy the position of PlanetAll's senior vice-president for marketing and business development and would begin work on August 17.

Dotson then resigned from SportsLine, did not replace his

---

   *A:* "PlanetAll, conceptually, it was a service where you could put all of your contact information on a Web site, contact information and calendar, and you could basically put your calendar and address book online, and then synchronize it down to palm pilots or to a desktop computer, and you could give other people access to your contacts. And you could set up profiles where if you're going to be, let's say in Minneapolis, Minnesota, it would alert everybody in your contact address book that also is a member of PlanetAll, that you were going to be within a thirty mile range of Minneapolis, Minnesota. And so just as sort of a — it's sort of hard to describe, but it was an address book and calendar on the Web that could synchronize and communicate and notify different people about different — different things."

Our decision of the appeal does not require a precise understanding of these services.

Florida apartment lease after its expiration in September, and bypassed a friend's offer of a continuing apartment rental in Florida. He did not search for another residence in Florida.

During a visit to Boston on August 9, 1998, Dotson made a deposit toward the purchase of a condominium residence in the Back Bay section of the city. The purchase closed on September 21 at a price of $480,000. He equipped the unit with furniture and household goods from his Florida apartment. He brought one of his two cars from Florida and his two pet dogs. He left his second car and certain other personal property in storage in Florida. He retained his Florida driver's license and voter registration.

Dotson arrived in Boston on August 16, 1998, to begin work. As he awaited final purchase of the condominium, he rented (consecutively, for several weeks each) two furnished apartments during August and September. As scheduled, he began work on August 17. During the following weeks he opened a bank account; established a post office box in Cambridge and received mail at the condominium; acquired a telephone landline and a facsimile line at his home; joined a gymnasium in Boston; and subscribed to a Boston newspaper and periodical.

Dotson performed his work at PlanetAll's Cambridge offices through the second half of August and throughout September and October.[2] In early November, 1998, he learned that Amazon was planning to move PlanetAll's offices to Seattle. He submitted his resignation on or about November 8. During November, Amazon, as successor-in-interest to PlanetAll, and Dotson negotiated a severance agreement designating November 9, 1998, as his date of termination and confirming Amazon's commitment to vest certain of his stock options immediately. The agreement recited that a stock split had drastically increased the number of shares available to him. He signed the agreement on January 11, 1999. On January 22, he exercised the options so as to purchase and then sell his allotted shares for a net gain of $5,317,145.35.[3] Amazon issued Dotson a Form W-2 for the proceeds as income.

---

[2]During this period he made several visits to family and friends in Connecticut, Tennessee, and Florida.

[3]The gain resulted from a cumulative 6:1 stock split and a steep increase of per share value between August 3, 1998, and January 22, 1999.

During December, 1998, Dotson had retained a real estate broker to search for a residence in the vicinity of Fort Lauderdale. On or about January 11, 1999, he made an offer on a home in that area. The owner accepted the offer on February 4. Dotson resided in the Boston condominium until March 7. He completed the purchase of the Florida residence on March 10 and moved in.

Dotson subsequently placed the Boston condominium on the market and sold it in August or September of 1999. In December of 1999, Dotson started a new job in Chicago. He moved there "in stages," beginning in 2000, when he bought a home there. He continued to reside in Chicago as of the time of the evidentiary hearing at the board in March of 2008.

2. *Procedural history.* Dotson originally filed a nonresident personal income tax return for 1999, and sought and received a refund of the tax upon the disputed income. As a result of an audit, the commissioner issued a notice of intent to assess personal income taxes in the original amount, plus accrued interest. The commissioner denied Dotson's application for an abatement. Dotson's appeal to the board resulted in an evidentiary hearing. G. L. c. 58A, § 8. Dotson and another witness testified in his behalf. Both Dotson and the commissioner submitted voluminous exhibits. The original decision of the board upheld the denial of the application for abatement.

Dotson appealed to this court. By an unpublished memorandum and order pursuant to our Rule 1:28, we vacated the board's decision and remanded the case to the board for a specific determination whether, by a preponderance of the evidence, the commissioner had proved that Dotson had taken residence in Massachusetts in August of 1998 "without any certain purpose to return" to Florida. *Dotson* v. *Commissioner of Rev.*, 77 Mass. App. Ct. 1109 (2010). By a revised report and findings of fact, the board concluded that the commissioner had carried that burden of proof so as to establish the Massachusetts domicil of Dotson at the time of his receipt of the stock sale proceeds. It reinstated its original decision. Dotson has timely appealed.

*Analysis.* 1. *Domicil standards.* The parties agree that Dotson's liability for the disputed income hinges entirely upon his domiciliary status on January 22, 1999, the date on which he exercised his stock options and realized the gain upon their

sale.[4] "Income . . . received by an individual . . . domiciled in Massachusetts when he received the income is subject to Massachusetts tax." *Commonwealth* v. *Moore*, 44 Mass. App. Ct. 129, 133 (1998). Generally, one's domicil is "the place where a person dwells and which is the center of his domestic, social and civil life." *Reiersen* v. *Commissioner of Rev.*, 26 Mass. App. Ct. 124, 125 (1988) (quotations and citation omitted). The more specific definition accruing from the case law makes domicil "the place of actual residence with intention to remain permanently or for an indefinite time and without any certain purpose to return to a former place of abode." *Commonwealth* v. *Davis*, 284 Mass. 41, 50 (1933). Accord, e.g., *Slater* v. *Munroe*, 313 Mass. 538, 545-546 (1943); *Rummel* v. *Peters*, 314 Mass. 504, 512-514 (1943); *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. 570, 578-579 (1974), and authorities cited; *Caffyn* v. *Caffyn*, 441 Mass. 487, 492 (2004); *McMahon* v. *McMahon*, 31 Mass. App. Ct. 504, 505 (1991).

As a further elaboration, several cases have included the observation that a person with a general intention to move elsewhere at a later time may still constitute a domiciliary. "The requisite intention is to make the place one's home *for the time at least*" (emphasis supplied). *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. at 578 (discussing resident students). See *Reiersen* v. *Commissioner of Rev.*, 26 Mass. App. Ct. at 125 (taxpayer found to be foreign domiciliary exempt from Massachusetts income tax); *Commonwealth* v. *Moore*, 44 Mass. App. Ct. at 130-134 (income tax liability upon substantial capital gain by recently arrived resident) (both employing *Hershkoff*'s phrase, "for the time at least"). The concept of "for the time at least" appears to recognize the reality that an indefinite presence can turn out to be a short presence.

Domicil requires a concurrence or convergence of (i) physical presence and (ii) mental state. The residence and the intent to remain indefinitely and with no certain purpose to return to a prior domicil must combine. See *Opinion of the Justices*, 5 Met.

---

[4]See G. L. c. 62, § 4, establishing taxation and rates for the income of Massachusetts "residents," and G. L. c. 62, § 1(*f*)(1), as appearing in St. 1995, c. 38, § 65, defining a "resident" as "any natural person domiciled in the commonwealth."

587, 589 (1843), overruled in nonpertinent part by *Hershkoff* v. *Registrars of Voters of Worcester*, *supra* at 578; *Tuells* v. *Flint*, 283 Mass. 106, 109 (1933); *Hershkoff*, *supra* at 576-577; *Dane* v. *Registrars of Voters of Concord*, 374 Mass. 152, 162 (1978); *Reiersen* v. *Commissioner of Rev.*, *supra* at 125.

The burden of proof of a change of domicil falls upon the party asserting the change. See *Commonwealth* v. *Davis*, 284 Mass. at 49 (burden on taxpayer alleging change of domicil from Massachusetts to Texas); *Hopkins* v. *Commissioner of Corps. & Taxn.*, 320 Mass. 168, 173 (1946) (burden on commissioner); *Mellon Natl. Bank & Trust Co.* v. *Commissioner of Corps. & Taxn.*, 327 Mass. 631, 638 (1951) (burden on commissioner); *Horvitz* v. *Commissioner of Rev.*, 51 Mass. App. Ct. 386, 393-395 (2001) (burden on commissioner). In this instance the commissioner is alleging the change of Dotson's domicil from Florida to Massachusetts as of August, 1998; she acknowledges that she bears the burden of proof of that change. If she carries that burden, then the onus to show that Dotson had moved his domicil from Massachusetts to Florida as of the date of his realization of the disputed income, January 22, 1999, will rest on his shoulders. "Domicile once acquired is not lost until a new one is obtained . . . and the [existing] domicile is presumed to have continued in the absence of compelling evidence that it was changed." *Horvitz* v. *Commissioner of Rev.*, 51 Mass. App. Ct. at 395, quoting from *Dane* v. *Registrars of Voters of Concord*, 374 Mass. at 162.

2. *Standard of review.* Under these standards, the parties have fought the case as a question of fact, i.e., the sufficiency of the evidence of Dotson's domicil at the time of his arrival in Massachusetts in August of 1998, and by extension at the time of his realization of the contested income in January of 1999. General Laws c. 58A, § 13, as appearing in St. 1998, c. 485, § 2, authorizes an appeal to this court from a decision of the board "as to matters of law." Decisional law has developed the range of review to include (a) examination of board decisions for mistakes of law, and (b) inspection of the board's findings of material fact for support by substantial evidence viewed as a question of law. See *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. 505, 511 (2002); *Boston Professional Hockey Assn.* v.

*Commissioner of Rev.*, 443 Mass. 276, 285 (2005); *Horvitz* v. *Commissioner of Rev.*, 51 Mass. App. Ct. at 395-396.

Under the substantial evidence standard, the "court may not displace an administrative [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Embers of Salisbury, Inc.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 526, 529 (1988), quoting from *Labor Relations Commn.* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971). Substantial evidence, as the measurement of review, need not amount to preponderant evidence. *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 257 (1996). Credibility determinations belong to the administrative fact finder, not to the reviewing court. See *Pyramid Co. of Hadley* v. *Architectural Barriers Bd.*, 403 Mass. 126, 131 (1988); *Hickey* v. *Commissioner of Pub. Welfare*, 38 Mass. App. Ct. 259, 262 (1995).

Finally, the standard of determination of the lack of substantial evidence in support of an agency finding is demanding. The court must conclude that "the evidence points to no felt or appreciable probability of [the finding] or points to an overwhelming probability of the contrary." *M & T Charters, Inc.* v. *Commissioner of Rev.*, 404 Mass. 137, 140 (1989), quoting from *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). The test is "whether a contrary conclusion is not merely a possible but a necessary inference from the findings." *Kennametal, Inc.* v. *Commissioner of Rev.*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998), quoting from *Commissioner of Rev.* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996).

3. *Domicil as of August, 1998.* The commissioner's burden was to show Dotson's (a) presence, *and* (b) his intent to remain permanently or indefinitely, *and* (c) the negative element of the absence of "any certain purpose to return" to a former home.[5] The thrust of Dotson's argument is that the commissioner failed to show his intention to remain indefinitely and his lack of a

---

[5]One could regard the lack of a certain purpose to return to a former location as merely an intensified expression of the intent to remain permanently or indefinitely in the present location. As a matter of caution, we weigh the evidence here under all three phases of the definition.

certain purpose to return to Florida. The evidence on the commissioner's side of the "domicil ledger"[6] was strong. After Dotson's awareness of the acquisition of PlanetAll by Amazon, he nonetheless chose to purchase a condominium unit in Boston, rather than take a short-term rental. He did not reserve any living arrangement in Florida as a fall-back residence. He did not begin to search for a home in Florida until December of 1998, after he had worked out his severance terms with Amazon. He brought furniture, household goods, a car, and his two pet dogs from Florida to Boston. The commissioner's evidence received additional incremental weight from Dotson's acquisition in Massachusetts of telephone and facsimile services, two mailing addresses, a gymnasium membership, and local newspaper and periodical subscriptions. All of those circumstances evidence the mentality of an indefinite, rather than specifically temporary, presence. Finally, although Dotson may have suspected Amazon's design to move PlanetAll from Cambridge to Seattle, no objective information came into evidence to indicate, as of August, 1998, whether or when it would do so. That event remained uncertain in fulfillment and timing as Dotson took up residence in Massachusetts in August.

On the other side of the evidentiary ledger, Dotson showed that he had retained his voting registration and his driver's license in Florida. The gravamen of his evidence was his testimony that he had come to Massachusetts with the intent to return to Florida upon the probable relocation of PlanetAll to Seattle. However, that mentality could not advance beyond a contingent plan as of August. Until the contingency materialized as a disclosure in November, his presence remained indefinite, and any purpose to return to Florida necessarily remained uncertain rather than certain. Finally, the hearing commissioner served as the judge of the credibility of Dotson's testimony about his state of mind at the time of his August arrival in Massachusetts. The hearing officer did not credit the proposal that Dotson had begun work at the time with a "certain purpose" to return to Florida. In sum, the balance of evidence provides substantial support for the board's finding of Massachusetts domicil in August of 1998.

---

[6] Compare *Reiersen* v. *Commissioner of Rev.*, 26 Mass. App. Ct. at 127.

4. *Domicil as of January 22, 1999.* Dotson's Massachusetts domicil would continue presumptively until and unless Dotson proved its change. To achieve an abatement, he would have to establish the evacuation from Massachusetts to Florida as of the receipt of the disputed income on January 22, 1999. The evidence did show that by that date he had decided to return to Florida, and had made an offer to purchase a residence in the Fort Lauderdale area.

However, he continued to reside in his Boston condominium until March 7, 1999. He did not complete the purchase of the Florida residence and move into it until March 10. A completed change of domicil demands the concurrence of both physical presence and the requisite state of mind. See *Reiersen* v. *Commissioner of Rev.*, 26 Mass. App. Ct. at 125, and authorities cited. The evidence at the board supports an intent to reside in Florida, but not the necessary presence as of January 22, 1999. The seller of Dotson's eventual new home did not accept his offer until February 4. Dotson did not close the purchase until March 10.[7] Consequently, he remained a domiciliary of Massachusetts on January 22, 1999. Substantial evidence supported a finding of Massachusetts domicil at the time of receipt of the disputed income.

5. *Additional matters.* At the board, the commissioner presented and preserved the separate contention that, even if Dotson were not domiciled in Massachusetts at the pertinent time, the stock proceeds constituted nonresident taxable "Massachusetts-source income" within the meaning of G. L. c. 62, § 5A(*a*). The board declined to reach the issue because its determination of Massachusetts domicil "rendered [it] moot." That issue has therefore played no part in this appeal.

Finally, the appeal does not contain any claims of unconstitutional unfairness. Dotson does not allege any redundant taxation of the same income by Florida. Nor does he argue that the Commonwealth failed to furnish the governmental premises in exchange for which it seeks tax revenues (a system of law,

---

[7]Although evidence at the board showed that Dotson's return to Florida would be relatively short-lived because he would accept a new position in Chicago nine months later, that information plays no part in our affirmance of his domiciliary status in Massachusetts.

order, public services, and economy enabling the creation of the wealth subjected to the tax imposed). See *Wisconsin* v. *J.C. Penney Co.*, 311 U.S. 435, 444 (1940) ("The simple but controlling question is whether the state has given anything for which it can ask return"); *General Motors Corp.* v. *Washington*, 377 U.S. 436, 441 (1964), overruled in nonpertinent part by *Tyler Pipe Indus., Inc.* v. *Washington Dept. of Rev.*, 483 U.S. 232, 248 (1987); *Standard Pressed Steel Co.* v. *Washington Dept. of Rev.*, 419 U.S. 560, 562 (1975).

*Conclusion.* The reinstated decision of the Appellate Tax Board dated October 29, 2010, is affirmed.

*So ordered.*