LYNCH, Chief Judge.
By nearly a two-to-one margin in the year 2000, Massachusetts voters passed Article 120, which amended the state constitution to disqualify currently incarcerated felons from voting in certain elections. Shortly thereafter, the state legislature extended this disqualification by statute, Chapter 150, to prevent inmates from voting in all Massachusetts elections.
In 2001, several incarcerated felons in state custody, challenged these provisions (collectively “Article 120”) by suing the Secretary of the Commonwealth in federal court. This appeal concerns two of their claims: (1) that the Commonwealth’s disenfranchisement provisions violated the Voting Rights Act (‘VRA”) § 2, 42 U.S.C. § 1973, because the percentage of imprisoned felons who are Hispanic or African-American is higher than the percentages of those groups in the population of the state; and (2) that the provisions violated the Ex Post Facto Clause, U.S. Const, art. I, § 10, as to those inmates who were not disqualified from voting before the these provisions took effect. As to their claim under the VRA, the plaintiffs make no allegation of any intentional discrimination or of any history by Massachusetts of intentional discrimination against minority voters. All they have claimed is that past practices in the Massachusetts criminal justice system produced inmate populations which, in combination with the disqualification of inmates imprisoned for felonies, have resulted in disproportionate disqualification of minorities from voting. Theirs is a claim of disparate impact.
After allowing initial discovery, the district court in 2007 denied the Commonwealth’s motion for entry of judgment on the pleadings on plaintiffs’ VRA claim but granted the Commonwealth’s motion for summary judgment on the Ex Post Facto Clause argument.
We think it clear from the language, history, and context of the VRA that Congress never intended § 2 to prohibit the states from disenfranchising currently incarcerated felons. We do not say that direct vote denial claims of other types may not be brought under § 2, only that no VRA claim is stated against a state law which disenfranchises incarcerated felons. We reverse and order the dismissal of the VRA § 2 claim. We affirm the grant of summary judgment on the Ex Post Facto claim.
I.
A. Enactment of the Massachusetts Incarcerated Felon Disenfranchisement Provisions
Before Article 120 was enacted, prisoners were able to vote by absentee ballot. In 1997, there was an unsuccessful proposal for legislation to disenfranchise cur *27 rently incarcerated persons for certain felonies: murder, rape, other sex-related offenses, and controlled substances offenses. Massachusetts prisoners respond-, ed by forming a political action committee (“PAC”), aimed at influencing criminal justice issues, including sentencing, prison reform, and “Draconian laws on punishment.” PACs, inter alia, raise money for and endorse candidates.
State elected officials reacted swiftly. On August 12, 1997, then-Acting Governor Cellucci proposed a constitutional amendment that would disenfranchise all incarcerated individuals (not just felons), saying:
Criminals behind bars have no business deciding who should govern the law-abiding citizens of the Commonwealth. This proposed amendment will ensure that criminals pay. their debt to society before they regain their right to participate in the political process.
The legislature did not act on this proposal. Rather, the legislature approved a different proposed amendment that would disenfranchise only those currently incarcerated for felonies. Lawmakers received the legal opinions of House and Senate Counsel that such an alternative amendment would be constitutional under the U.S. Constitution.
Article 120, the proposed amendment to Article 3 of the Amendments to the state constitution, was presented to the voters along with an Information for Voters Guide. That Guide constitutes relevant legislative history. The Guide included 150-word arguments written by proponents and opponents of each ballot question. The statement from the proponents stated, “A yes vote prevents criminals serving time for a felony conviction from voting in Massachusetts’s elections while in jail.” The proponents argued:
When someone fin Massachusetts is sentenced to jail for committing a felony, we deprive them of their liberty and right to exercise control over their own lives, yet current law allows these same criminals to continue to exercise control over our lives by voting from prison. This amendment will change the law that gives jailed criminals the right to vote.
Massachusetts is. one of only three states in our nation where felons serving time may vote while in jail. Voting yes on this important question will make the Commonwealth the 48th state to prohibit the practice of allowing convicted criminals to vote from jail. This change discriminates against no one except jailed criminals.
The Guide also contained the opponents’ argument:
The Constitution of Massachusetts is clear on this point: Citizens retain their right to vote even while incarcerated. The founders of Massachusetts intended this right, and our Supreme Judicial Court affirmed in in 1977. In the history of the Commonwealth, we have never amended our Constitution in order to narrow fundamental rights. There is no reason to do so now.
No one has alleged that prisoner voting has harmed our democracy or social fabric. Very few prisoners vote, and no one claims that prisoner voting has negatively influenced any election. Stripping incarcerated felons of their right to vote serves no public safety function. It will not deter crime, repair the harm done by crime, nor help to rehabilitate prisoners.
The voters approved the amendment with 60.3% voting “yes” to 33.9% voting “no,” and 5.8% of voters not casting a vote on the question. The amendment took effect on December 6, 2000. Article 3 now reads:
*28 Every citizen of eighteen years of age and upwards, excepting persons who are incarcerated in a correctional facility due to a felony conviction, and excepting persons under guardianship and persons temporarily or permanently disqualified by law because of corrupt practices in respect to elections who shall have resided within the town or district in which he may claim a right to vote, six calendar months next preceding any election of governor, lieutenant governor, senators or representatives, shall have a right to vote in such election of governor, lieutenant governor, senators and representatives; and no other person shall be entitled to vote in such election.
Mass. Const. amend, art. 3 (emphasis added).
The Massachusetts legislature then enacted Chapter 150 of the Acts of 2001, which effectuated Article 120 by broadening the ban on felon voting to cover all Massachusetts elections and by changing the statutory requirements for obtaining absentee ballots. Chapter 150 took effect November 27, 2001. Unlike many other states, Massachusetts does not disqualify convicted felons from voting once they are released from prison.
B. Procedural History of the Litigation
Plaintiffs Paul Simmons, an African-American, Pedro Valentin, a Hispanic-American, and Dennis J. Beldotti, a Caucasian-American, are Massachusetts residents currently in the custody of the Massachusetts Department of Correction for felonies they committed on or before December 5, 2000. Plaintiffs were eligible to be Massachusetts voters before that date, but the record does not reveal whether they were registered to vote.
Plaintiffs’ pro se complaint was amended twice by court-appointed counsel. Their final amended complaint alleged that Article 120 violates § 2 of the VRA because it has a “disproportionately adverse effect on the voting rights of African-Americans and Hispanic Americans compared to its effect on the voting rights of other citizens.” This effect “is caused by, among other things, the facts that African-Americans and Hispanic-Americans are overrepresented in the population of Massachusetts incarcerated felons, and that there exists considerable racial and ethnic bias, both direct and subtle, in the Massachusetts court system.”[1] Article 120, plaintiffs contended, “interacts] with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and non-minority voters to elect their preferred representatives.”
In describing plaintiffs’ complaint, which alleges a “vote denial” claim, we distinguish vote denial cases from vote dilution[2] claims under § 2 of the VRA. The Su *29 preme Court first articulated the distinction in explaining that “[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot.” Shaw v. Reno, 509 U.S. 630, 640, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 569, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)). Thus in voting rights parlance, ‘“[v]ote denial’ refers to practices that prevent people from voting or having their votes counted.” D.P. Tokaji, The New Vote Denial: Where Election Reform Meets the Voting Rights Act, 57 S.C. L.Rev. 689, 691 (2006). Vote denial cases challenge practices such as literacy tests, poll taxes, white primaries, and English-only ballots. Id. By contrast, vote dilution challenges involve “practices that diminish minorities’ political influence,” such as at-large elections and redistricting plans that either weaken or keep minorities’ voting strength weak. Id.; see also P.S. Karlan, The Impact of the Voting Rights Act on African Americans, in Voting Rights and Redistricting 121, 122 (M.E. Rush ed., 1998).
To be clear, plaintiffs did not allege and have disavowed making a § 2 vote dilution claim, such as that the votes of African-Americans and Hispanics who are not imprisoned for felonies have been diluted by Article 120. This case also does not involve any claim that generalized rules or practices governing the administration of elections have resulted in a disproportionate denial of votes of minorities. Further, plaintiffs have not asserted that the state has otherwise created barriers to the election of minority group members or other participation of minorities in the political process. Finally, the plaintiffs’ complaint made no allegation that the Commonwealth acted with racially discriminatory intent or purpose in enacting Article 120, and plaintiffs have specifically disavowed any such claim. This is a claim based purely on the allegation that Article 120 has a disparate impact on minorities by disqualifying from voting imprisoned felons.
In support of their pleadings, the complaint referred to and appended a 1994 Final Report by the Commission to Study Racial and Ethnic Bias in the Courts to the Massachusetts Supreme Judicial Court (“SJC”).[3] Plaintiffs alleged the legislators were aware of or should have been aware of the conclusions in that 1994 Report. That 1994 Report, however, was not referenced in or part of the Voters Guide, and there is no claim the voters were aware of it.
Plaintiffs further alleged that Article 120 is punitive in purpose and effect and therefore violates the Ex Post Facto Clause as to those inmates who committed their offenses before the disenfranchisement measures took effect.
The relief sought was a declaration that Article 120 was unconstitutional under the Ex Post Facto Clause and illegal under § 2 of the VRA, injunctive relief, and costs and attorneys’ fees.
*30 Plaintiffs unsuccessfully moved for a preliminary injunction; defendant opposed, filing affidavits which described the legislative history of Article 120 and the ratification process. The parties conducted written discovery.[4] Defendant then moved for summary judgment as to the Ex Post Facto and equal protection claims and for judgment on the pleadings as to the VRA § 2 claim on January 12, 2007. The plaintiffs opposed the Commonwealth’s motions and also cross-moved for summary judgment as to the Ex Post Facto and equal protection claims.
On August 30, 2007, the district court granted the Commonwealth’s motion for summary judgment on the Ex Post Facto Clause claim and the equal protection claim and denied plaintiffs’ cross-motion. The court denied the Commonwealth’s motion on the VRA claim. On January 16, 2008, the district court certified its order on the VRA claim for interlocutory appeal. Plaintiffs petitioned to cross-appeal on the Ex Post Facto and equal protection claims. This court granted leave to appeal all three claims under 28 U.S.C. § 1292(b). Plaintiffs have abandoned the Equal Protection Clause claim and contest only the Ex Post Facto Clause ruling, and the Commonwealth appeals the denial of its motion for judgment on the pleadings as to the VRA § 2 claims.
C. Standard, of Review
Our review of the court’s ruling on both claims is de novo, and we take the facts in the light most favorable to the plaintiffs. Estate of Bennett v. Wainwright, 548 F.3d 155, 163, 165 (1st Cir.2008) (considering dismissals under Rule 12(c) and Rule 56). We treat the denial of a motion for judgment on the pleadings “much like a Rule 12(b)(6) motion to dismiss.” Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir.2008).[5] “[T]o survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that ‘raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.’ ” Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Nonetheless, questions of statutory interpretation are questions of law ripe for resolution at the pleadings stage. Gen. Motors Corp. v. Darling’s, 444 F.3d 98, 107 (1st Cir.2006) (“Statutory interpretation typically raises questions of law engendering de novo review.”).
II.

VRA § 2 CLAIM

Plaintiffs’ § 2 challenge is to the Massachusetts law disenfranchising only currently incarcerated felons. Article 120 is among the narrowest of state felon disen *31 franchisement provisions.[6] Only two states permit incarcerated felons to vote, and Massachusetts is one of thirteen jurisdictions that limit disenfranchisement to the period of incarceration. Currently, thirty-five states prevent felons from voting during the period of their parole or probation or both. Eleven states disenfranchise felons beyond the term of their incarceration, probation, and parole. Two states disenfranchise felons for life.
The question of state felon disenfranchisement laws and the VRA § 2 has been addressed by five circuits. Four circuits, including two en banc, have rejected § 2 challenges to broader disqualifications; one panel in the Ninth Circuit had allowed such a § 2 challenge to go forward, although it was ultimately unsuccessful. The Second Circuit, consistent with our holding here, has rejected a § 2 challenge to a state statute disenfranchising prisoners, as well as parolees. Hayden v. Pataki, 449 F.3d 305 (2d Cir.2006) (en banc). Faced with a state lifetime felon disenfranchisement law, the Eleventh Circuit concluded in an en banc decision that all felon disenfranchisement claims are excluded from the scope of § 2 of the VRA. Johnson v. Gov. of Fla., 405 F.3d 1214 (11th Cir.2005) (en banc). Two circuits have rejected similar claims on the pleadings without directly considering whether felon disenfranchisement statutes are immune from attack under § 2. Howard v. Gilmore, No. 99-2285, 2000 WL 203984, at *1 (4th Cir. Feb.23, 2000) (per curiam); Wesley v. Collins, 791 F.2d 1255, 1259-61 (6th Cir.1986) (treating claim as a dilution claim). Our conclusion accords with that of the majority of the circuits.
A Ninth Circuit panel decision has concluded that some disenfranchisement statutes, not as narrow as this one, may be challenged under § 2. Farrakhan v. Washington, 338 F.3d 1009 (9th Cir.2003) (addressing disenfranchisement of those convicted of an “infamous crime” until those former felons comply with civil rights restoration statute). Over a dissent by seven judges, the Ninth Circuit denied the state’s petition for rehearing en banc in that case, Farrakhan v. Washington, 359 F.3d 1116, 1116 (9th Cir.2004) (Kozinski, J., dissenting). On remand, judgment was entered for the state. Farrakhan v. Gregoire, No. CV-96-076-RHW, 2006 WL 1889273 (E.D.Wash. July 7, 2006).
A. Constitutional Background to the VRA § 2 Claim
Under the U.S. Constitution, the states generally set the eligibility criteria for voters. “[T]he Constitution ‘does not confer the right of suffrage upon any one.’ ” Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) (quoting Minor v. Happersett, 88 U.S. (21 Wall.) 162, 178, 22 L.Ed. 627 (1874)); see also U.S. Const. art. I, § 4; id. amend. XIV, § 2; Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam) (“The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college.”).
The criteria for eligibility to vote are defined by the states, subject to certain federal restrictions, such as the federal *32 constitutional prohibition on exclusion from the franchise on the basis of race, sex, or payment of a poll tax. “No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices.” Oregon v. Mitchell, 400 U.S. 112, 125, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).
The power of the states to disqualify from voting those convicted of crimes is explicitly set forth in § 2 of the Fourteenth Amendment. The Supreme Court has held, “the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment.” Richardson v. Ramirez, 418 U.S. 24, 55, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). Section 2 concerns the abridgement of the right to vote at any election for “President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or members of the Legislature.” U.S. Const, amend. XIV, § 2. The Amendment specifically excludes (from its non-abridgement language) and thus provides for the denial by states of the right to vote to persons “for participation in rebellion, or other crime.” Id. The Fourteenth Amendment also grants Congress the power to enforce, by appropriate legislation, the provisions of that article. Id. § 5. Thus, the state’s denial of the right to vote to felons has a constitutional grounding.
Broad felon disenfranchisement provisions are presumptively constitutional. See Richardson, 418 U.S. at 54-55, 94 S.Ct. 2655.[7] There, the Court rejected a non-race-based equal protection challenge to the felon disenfranchisement provision of California’s constitution. The Supreme Court has continued to adhere to Richardson. See Romer v. Evans, 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (describing principle that states may disenfranchise a convicted felon as “unexceptionable”).
Richardson, to be clear, does not hold that a state felon disenfranchisement law may never raise equal protection concerns. If a state enacts a law which disenfranchises felons “with the intent of disenfranchising blacks,” that state has run afoul of § 1 of the Fourteenth Amendment. Hunter v. Underwood, 471 U.S. 222, 229, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (holding Alabama’s petty crime and misdemeanor disenfranchisement provisions unconstitutional under Equal Protection Clause based on evidence of discriminatory intent); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 477, 105 S.Ct. 3249, n. 25, 87 L.Ed.2d 313 (1985) (“[In Hunter ], we did not suggest that felons could not be deprived of the vote through a statute motivated by some purpose other than racial discrimination.”). Here, plaintiffs make no allegation of intentional discrimination, and on appeal they allege no constitutional violation other than the Ex Post Facto claim. By definition, then, plaintiffs do not assert that whatever discrimination existed in the state’s criminal justice system rose to the level of an independent constitutional violation which caused the vote denial.
A state’s interest in preventing “persons who ... were not eligible to vote because they had been convicted of felonies” from inflating its voter rolls was accepted only last year by the Supreme Court as a “neu *33 tral and nondiscriminatory reason” for a voter identification law. Crawford v. Marion County Election Bd., — U.S. —, 128 S.Ct. 1610, 1619-20, 170 L.Ed.2d 574 (2008).
The legitimacy of the reasons for this state interest in disqualifying imprisoned felons from voting is apparent. Judge Henry Friendly some time ago described some of the pragmatic purposes underlying disenfranchisement laws:
[I]t can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases.
Green v. Bd. of Elections, 380 F.2d 445, 451 (2d Cir.1967).[8]
Here, the Commonwealth enacted this prohibition after prisoners attempted to organize to change the laws under which they were convicted, sentenced, and imprisoned. The state has a strong interest in setting its own qualifications for voters, a strong interest in the integrity of its system of enforcing and administering its criminal laws, and a strong interest in how its correctional systems are maintained and run. Preiser v. Rodriguez, 411 U.S. 475, 491-92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (“It is difficult to imagine an activity in which a State has a stronger interest ... than the administration of its prisons.”); cf. Hayden, 449 F.3d at 327. The Massachusetts provision, it is important to note, is narrowly tailored. Because the disqualification is confined to currently imprisoned felons, the state interests it serves are clearly at their strongest.
Further, Article 120 of the Massachusetts constitution does not raise issues about a history of laws in Massachusetts, including felon disenfranchisement laws, that were used deliberately to impede voting by minorities. Such historical concerns about practices in other states have been the subject of academic commentary. See, e.g., G. Brooks, Comment, Felon Disenfranchisement: Law, History, Policy and Politics, 32 Fordham Urb. L.J. 851, 858-59 (2005) (concluding that the VRA does not reach state felon disenfranchisement laws). Plaintiffs have made no claim that Massachusetts has historically ever used any tests or devices to discourage minority voting or minority candidates. Nor is there any claim that Massachusetts has defined Article 120 disenfranchisement in terms of felonies that have higher conviction rates for minorities than for whites. Cf. Hunter, 471 U.S. at 229, 105 S.Ct. 1916.
B. Text, Context and Legislative History of§ 2
It is against the backdrop of the Constitution’s express approval of felon disenfranchisement provisions, which were not motivated by intentional race discrimination, that Congress enacted the VRA in 1965.
*34 Section 2 of the VRA, 42 U.S.C. § 1973, as amended in 1982, now provides:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....
(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
While the language of the original § 2 tracked the language of the Fifteenth Amendment, prohibiting practices that deny or abridge the right to vote on account of race, the 1982 amendment to § 2 inserted the phrase “results in a denial or abridgment.” § 1973(b) (emphasis added). The amendment of § 2 also made clear that an abridgement or denial could be identified “as provided in subsection (b),” which was added by the 1982 amendments.
To start, it is clear that under the plain terms of the statute, not every “voter qualification” is actionable under § 2. For § 2 to apply, the burden is on the plaintiffs to make other showings, including that the qualification “results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” § 1973(a); see also Metts v. Murphy, 363 F.3d 8, 12 (1st Cir.2004) (en banc) (per curiam).
Plaintiffs’ theory of how they meet this burden under § 2 is that from the very enactment of § 2 in 1965, the broad language of § 2 has created a cause of action on these facts. Article 120, they contend, is obviously a voter disqualification and the disqualification results in a denial of the right to vote “on account of race” because the percentages of incarcerated felons who are black or Hispanic are higher than those two groups in the population as a whole.
Plaintiffs argue the language of § 2(a) is so clear it stands alone and that rules of statutory construction prohibit consideration of the history or context of § 2.[9] Plaintiffs’ claim assumes that felon disenfranchisement laws are not different from and should be treated like any other voting qualification under § 2. That assumption is a fatal flaw in their case. Felon disenfranchisement statutes are not like all other voting qualifications. Congress has treated such laws differently. They are deeply rooted in our history, in our laws, and in our Constitution. We conclude Congress did not intend § 2 to provide a cause of action against Article 120.
*35 As a matter of textual analysis, it is neither plain nor clear that plaintiffs’ claim fits within the text of § 2(a). For example, it is logical to understand the state law disenfranchisement of incarcerated felons as not “resulting” in a denial “on account of race or color” but on account of .imprisonment for a felony, and thus not within the text of § 2 at all.[10] We agree with the Second Circuit that the language of § 2(a) is both broad and ambiguous and that judicial interpretation of a claim concerning felon disenfranchisement under the VRA may not be limited to the text of § 2(a) alone. See Hayden, 449 F.3d at 315 (citing Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170(1928)).
Under any set of rules of construction, our inquiry into § 2(a) neither starts nor ends with an examination of that text. “[Statutory interpretation turns on ‘the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.’ ” Nken v. Holder, — U.S. —, 129 S.Ct. 1749, 1756, 173 L.Ed.2d 550 (2009) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).
Under Supreme Court precedent, we cannot adopt plaintiffs’ limited approach. The direction to look at context, structure, history, and constitutional concerns is particularly true of the VRA, a complex statute with an extensive legislative history and caselaw. See Nw. Austin Mun. Util. Disk No. 1 v. Holder, — U.S. —, 129 S.Ct. 2504, 2513-14, 174 L.Ed.2d 140 (2009) (“[Sjpecific precedent, the structure of the Voting Rights Act, and underlying constitutional concerns compel a broader reading of the [VRA’s] bailout provision.”). The Supreme Court itself, in deciding § 2 cases has never resorted to plain text alone to give § 2 meaning. See, e.g., Chisom v. Roemer, 501 U.S. 380, 397, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). It has commonly used legislative history. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 426, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006); see also 2A N.J. Singer & J.D. Singer, Sutherland Statutes and Statutory Construction § 48A:11 (7th ed. 2008) (“In reviewing legislative history, the Court consults ... committee reports, floor debates, hearings, rejected proposals, and even legislative silence.”).
In examining § 2, we are required to comply with “the cardinal rule that a statute is to be read as a whole,” King v. St. Vincent’s Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991). As “the meaning of statutory language, plain or not, depends on context,” id., we must “look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.” Dada v. Mukasey, — U.S. —, 128 S.Ct. 2307, 2317, 171 L.Ed.2d 178 (2008) (quoting Gozlon-Peretz v. United States, 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991)) (internal quotation marks omitted).
When we look at the terms of the original VRA as a whole, the context, and recognized sources of congressional intent, *36 it is clear the original § 2 of the VRA of 1965 was not meant to create a cause of action against a state which disenfranchises its incarcerated felons. The purposes and congressional history of the 1982 amendments, as well as congressional action after 1982, further confirm our understanding that § 2 does not encompass this claim.
1. The Original VRA of 1965
The original VRA was enacted against the background of explicit constitutional and congressional[11] approval of state felon disenfranchisement laws and expressed no intention to invalidate such laws, but rather an intention to leave such laws untouched.
Prior to the enactment of the VRA, enforcement of the Fifteenth Amendment guarantee that the “right of citizens of the United States to vote shall not be denied or abridged ... on account of race, color, or previous condition of servitude,” U.S. Const. amend. XV, § 1, was unsatisfactory. Nw. Austin, 129 S.Ct. at *2508-09.
In 1965, Congress enacted the VRA with the intent to “banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts of our country for nearly a century.” South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Plaintiffs’ claim here concededly does not involve any such intent. The language of the original § 2 “tracked ... the text of the Fifteenth Amendment,” Bartlett, 129 S.Ct. at 1240. The Court emphasized this point when it said that the original § 2 did “no more than elaborate[ Jupón ... the Fifteenth Amendment,” id. at 1241 (omission in original) (quoting City of Mobile v. Bolden, 446 U.S. 55, 60-61, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion)) (internal quotation marks omitted). The VRA’s original object was plainly to combat specific forms of racial discrimination.[12] Beyond § 2, the remainder of the VRA set up a scheme of stringent remedies to address the most flagrant practices. “[TJhe Act directly pre-empted the most powerful tools of black disenfranchisement in the covered areas. All literacy tests and similar voting qualifications were abolished by § 4 of the Act.” Nw. Austin, 129 S.Ct. at *2509, (citing Voting Rights Act of 1965, §§ 4(a)-(d), 79 Stat. 437, 438-439).
The legislative history of the VRA shows that Congress was not silent with respect to felon disenfranchisement laws. In fact, Congress explicitly considered the effect of the VRA on state felon disenfranchisement laws, and did so under § 4, rather than under § 2.[13] Section 4 of the VRA bans any “test or device” that impermissibly limits the franchise. 42 U.S.C. § 1973b(c). Congress, in enacting § 4(c) proscribed several categories of historically discriminatory tests or devices, including some literacy tests, educational achievement or knowledge tests, and good moral character qualifications. But Congress was careful to carve out from its proscription of tests for good moral character any and all state *37 felon disenfranchisement laws. H.R.Rep. No. 89-439 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2547-57. In excluding felon disenfranchisement laws from the scope of § 4, Congress took the view that it did not consider such laws to be a discriminatory voter qualification or a “tool[ ] of black disenfranchisement.” Nw. Austin, 129 S.Ct. at *2509.
The Senate Judiciary Committee Report explicitly stated that this § 4 prohibition on tests and devices “would not result in the proscription of the frequent requirement of States and political subdivisions that an applicant for voting or registration for voting be free of conviction of a felony or mental disability.” S.Rep. No. 89-162 (1965), reprinted in 1965 U.S.C.C.A.N. 2508, 2562 (joint views of Senators Dodd, Hart, Long, Kennedy, Bayh, Burdick, Tydings, Dirksen, Hruska, Fong, Scott, and Javits).
The House Report confirms the Senate’s understanding. It stated that the VRA “does not proscribe a requirement of a State or any political subdivision of a State that an applicant for voting or registration for voting be free of conviction of a felony or mental disability.” H.R.Rep. No. 89-439, reprinted in 1965 U.S.C.C.A.N. at 2457.
In drafting the VRA, Congress considered felon disenfranchisement statutes, and it viewed them as a potential test or device that fell within the purview of § 4 and not § 2. We are not free to second guess Congress’s categorizations of felon disenfranchisement statutes. Further, Congress made clear that it did not purport to outlaw state felon disenfranchisement statutes based on their effect. Rather, under § 4, Congress enumerated and outlawed tests or devices it viewed as disqualifications excluding minority voters. Felon disenfranchisement laws were specifically removed from this category by Congress and were considered nondiscriminatory.
In light of this express history, Congress could not have intended to create a cause of action under § 2 of the VRA against disenfranchisement of incarcerated felons while saying explicitly elsewhere that it did not intend to proscribe any such laws. Other courts agree with our conclusion. Hayden, 449 F.3d at 319 (“[I]t is apparent to us that Congress’s effort to highlight the exclusion of felon disenfranchisement laws from a VRA provision that otherwise would likely be read to invalidate such laws is indicative of its broader intention to exclude such laws from the reach of the statute.”); see also Farrakhan, 359 F.3d at 1120-21 (Kozinski, J., dissenting from denial of reh’g en banc).
This point is buttressed by another aspect of § 4. As drafted in 1965, § 4 applied to covered jurisdictions.[14] Congress would not have permitted felon disenfranchisement laws in covered jurisdictions where there was a history of discrimination, while prohibiting them in non-covered jurisdictions like Massachusetts. To subject felon disenfranchisement in a non-covered jurisdiction to a VRA cause of action while prohibiting such a cause of action for a covered jurisdiction would itself raise sig *38 nificant constitutional concerns. See Nw. Austin, 129 S.Ct. at *2513,.
If there were any doubt as to Congress’s intent not to create a cause of action against laws like Article 120, other actions show congressional acceptance of even broader felon disenfranchisement laws than involved here, reinforcing the conclusion that § 2 was not meant to proscribe laws such as Article 120. In 1971, just six years after passing the VRA, Congress affirmatively enacted a broader felon disenfranchisement statute covering both imprisoned and paroled felons in the District of Columbia, over which it then exercised plenary power. Act of Dec. 23, 1971, Pub.L. No. 92-220, § 4, 85 Stat. 788, 788; see also Hayden, 449 F.3d at 315. Congress would not have prohibited states from imposing such disqualifications when it imposed them itself on the District.
Further, between the passage of the VRA in 1965 and the 1982 amendments, Congress considered and rejected proposals to amend the VRA[15] to prohibit certain types of state felon disenfranchisement laws. Congress understood that the VRA, as enacted in 1965, did not permit claims against state felon disenfranchisement laws and that amendment of the VRA would be needed to permit such suits, and it declined to make those amendments. Two points are important. First, Congress rejected each those proposed amendments. Second, even those rejected amendments would have precluded suits raising claims of disenfranchisement of a “citizen [who] is confined in a correctional facility at the time of such ... election,” as does Article 120 now at issue. See Ex-Offenders Voting Rights: Hearing on H.R. 9020 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm, on the Judiciary, 93d Cong. 4 (1974).
In 1972, the House Judiciary Committee held hearings on “The Problems of the Ex-Offender.” See Corrections, Part VI, Illinois: The Problems of the Ex-Offender: Hearing Before Subcomm. No. 3 of the H. Comm. on the Judiciary, 92d Cong. (1972). In response to these hearings, several prominent VRA advocates in Congress jointly introduced a bill designed “to amend the [VRA] to prohibit the States from denying the right to vote in Federal elections to former criminal offenders who have not been convicted of any offense related to voting or elections and who are not confined in a correctional institution.” Hayden, 449 F.3d at 319 (emphasis added) (quoting H.R. 15,049, 92d Cong. (1972)) (internal quotation marks omitted). The bill did not result in legislation. Id.
Similarly, Congress held hearings in 1973 expressly addressing but not adopting proposed amendments to the VRA to allow challenges to felon disenfranchisement for only that category of ex-offenders who were not imprisoned.[16] See Ex-Offenders Voting Rights: Hearing on H.R. 9020, supra, 93d Cong. 1-38; see also Hayden, 449 F.3d at 319.
*39 Plaintiffs’ claim that § 2 as drafted in 1965 permits a cause of action against Article 120 fails.
2. The 1982 Amendments
We reject plaintiffs’ position that § 2(b), added in 1982, may not be considered in analyzing whether they have a claim under § 2(a).[17] Furthermore, we conclude that those amendments, while altering the law as to vote dilution claims and perhaps as to other claims (which we need not decide), undercut plaintiffs’ arguments that Congress intended the VRA to reach laws disenfranchising incarcerated felons.
The 1982 amendments did not alter the prior understanding that the VRA did not reach the disenfranchisement of currently incarcerated felons. When “Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the [administrative or judicial] interpretation given to the incorporated law, at least insofar as it affects the new statute.” Lorillard v. Pons, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Nothing in the text, context,[18] or history supports plaintiffs’ position.
The Supreme Court held that “Congress amended § 2 of the VRA to make clear that certain practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.” Chisom, 501 U.S. at 383-84, 111 S.Ct. 2354 (emphasis added); Johnson, 405 F.3d at 1228. Felon disqualification was not among those certain practices and procedures.
Plaintiffs admirably admit that Congress’s specific purpose in amending § 2 of the VRA[19] was to overrule certain aspects *40 of the Supreme Court’s decision in Bolden, which was concerned with vote dilution claims, not direct denial claims. We explain. Prior to Bolden, in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), minority plaintiffs had successfully challenged a state districting plan on vote dilution grounds. There, the Court did not require a showing of discriminatory intent. See id. at 766. By contrast, the Bolden plurality held that state action “that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose,” 446 U.S. at 61, 100 S.Ct. 1490, and altered the White evidentiary standard in vote dilution cases to require direct evidence of discriminatory intent.[20] See Bartlett, 129 S.Ct. at 1240-41.
In 1982, Congress focused on reversing this aspect of Bolden and clarifying the standard for vote dilution claims. Congress aimed to reinstate the “results test,” which had been the rule developed in the pr e-Bolden case law for vote dilution claims under White. See Metts, 363 F.3d at 10 (stating the 1982 amendments made it clear that “discriminatory intent is not a necessary element in a violation and that Congress [instead] intended a broad range of factors to be taken into account”). But the reinstated, multifactored results test was not meant to extend to this limited felon disenfranchisement claim any more than the pr e-Bolden tests were. Nothing in the legislative history of § 2(b) indicated any intent to expand the VRA to create a cause of action against a state felon disenfranchisement law such as Article 120. To the contrary, in enacting § 2, Congress noted that it was impossible to predict the variety of means that would be used to infringe on the right to vote and that the voting rights landscape was marked by innovation in discrimination. S.Rep. No. 89-162, at 5 (1965); S.Rep. No. 89-439, at 10. But these concerns do not go to felon disenfranchisement, which was neither a new innovation nor a predictable future innovation. Felon disenfranchisement was a well-known and accepted part of the voting landscape. “The Senate Report, which details many discriminatory techniques used by certain jurisdictions, made no mention of felon disenfranchisement provisions.” Johnson, 405 F.3d at 1234; see also Tokaji, supra, at 707 (“The legislative history of the 1982 amendments thus shows that Congress was almost exclusively focused on vote dilution claims.”).[21]
Further, the language of § 2(b) undercuts plaintiffs’ assertion they have stated a claim under § 2(a). The text of subsection (b) protects a “class of citizens” who by law may and should enjoy as full an “opportunity [as] other members of the electorate to participate in the political process.” § 1973(b). For a host of valid reasons, incarcerated prisoners cannot participate in the political process equally with free citizens outside the prison walls. Hayden, 449 F.3d at 342 (Jacobs, J., concurring). As noted by Hayden, “There is no question that incarcerated persons can *41 not ‘fully participate in the political process’ — they cannot petition, protest, campaign, travel, freely associate, or raise funds.” Id. at 321.
Further, the 1982 Congress amended § 2 to assuage expressed fears that the courts would interpret a results test as a requirement for proportional representation in vote dilution cases, and therefore the statute was amended to expressly disclaim any right to proportional representation. § 1973(b) (“[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.”); Tokaji, supra, at 705-06. This suggests that Congress was fundamentally concerned with remedying discrimination in voting, rather than guaranteeing proportionality in political representation. See, e.g., S. Issacharoff, Polarized Voting and the Political Process, 90 Mich. L.Rev. 1833 (1992). Plaintiffs’ claim, which is based on mere disproportionality in the prison population from felon disenfranchisement, does not implicate these concerns.
3. Post-1982 Congressional Actions Assume the Validity of State and, Federal Felon Disenfranchisement Laws
Congressional action, both after 1982 and in the aftermath of Bush v. Gore, also undercuts the plaintiffs’ reading of the amended § 2 to support a claim against imprisoned felon disenfranchisement laws. These statutes show continuing congressional approval of state laws disenfranchising imprisoned felons. The National Voter Registration Act of 1993, which generally restricts states’ ability to remove names from the voter rolls, explicitly exempts state decisions to disenfranchise individuals “by reason of criminal conviction.” 42 U.S.C. § 1973gg-6(a)(3)(B). The Help America Vote Act of 2002 directs states to remove disenfranchised felons from their lists of those eligible to vote in federal elections. 42 U.S.C. § 15483(a)(2)(A)(ii)(I). These two recent statutes are entirely inconsistent with reading § 2, whatever its breadth, to create a cause of action against Article 120.
Further, Congress has continued to consider and reject numerous proposals to require states to enfranchise even former felons. Even these efforts have expressly excluded currently incarcerated felons. See, e.g., Civic Participation and Rehabilitation Act of 1999: Hearing on H.R. 906 Before the Subcomm. on the Constitution of the H. Comm, on the Judiciary, 106th Cong. 1, 3 (2000) (quoting H.R. 906, 106th Cong. (1999)).[22]
Congress has excepted from the reach of the VRA protections from vote denial for claims against a state which disenfranchises incarcerated felons. We do not need to decide[23] what is needed to prove a denial *42 (as opposed to a dilution) claim under § 2 which is not a claim against a state provision disenfranchising imprisoned felons.[24]
Given the historic legitimacy of felon disenfranchisement, the constitutional recognition of the authority of states to disenfranchise imprisoned felons, the congressional recognition of that authority and the express congressional statements that the VRA was not meant to proscribe that authority, this is not the case in which to test the standards for other types of purported direct disenfranchisement claims. While our emphasis is somewhat different, we agree with the Second Circuit in Hayden that the seven circumstances it identifies all necessitate the conclusion that the this claim is not actionable. 449 F.3d at 315-16.
Plaintiffs have failed to state a claim under VRA § 2. We have no need to reach the serious constitutional questions which the Commonwealth argues would be raised were we to adopt plaintiffs’ construction of the statute. In Northwest Austin, the Supreme Court emphasized the principle that courts, particularly in VRA cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue, as here. Nw. Austin, 129 S.Ct. at *2508 (“Our usual practice is to avoid the unnecessary resolution of constitutional questions.”); see also Hayden, 449 F.3d at 328 n. 24; Johnson, 405 F.3d at 1230.
III.

EX POST FACTO CLAUSE CLAIM

We turn to plaintiffs’ appeal from the district court’s grant of summary judg *43 ment in favor of the Commonwealth on the Ex Post Facto Clause arguments. There are no material facts in dispute in the record.
Plaintiffs argue the Ex Post Facto Clause was violated because “the only plainly discernible purpose for Article 120 was to seek to impose an additional measure of punishment upon those who had violated the laws of the Commonwealth.” Plaintiffs point to the a transcript of the debates at the 1998 and 2000 Constitutional Conventions over the bill that ultimately became Article 120. Plaintiffs also rely on language from Acting Governor Cellucci’s proposed amendment and his statements to the public, an amendment which was not accepted. These statements include: “The time has come to tell would-be criminals in Massachusetts that committing crimes has serious consequences,” and that “[p]risons are a place for punishment.” Even though his initial proposal was never in fact acted on by the legislature, we consider his comments as part of the background.
Analysis of the Ex Post Facto Clause claim involves a two-part inquiry. The first asks whether the denial of the right to vote is a civil, regulatory measure within the meaning of the caselaw, or whether it is punitive. “[W]here unpleasant consequences are brought to bear upon an individual for prior conduct,” the central question “is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation.” De Veau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (holding that state statutory bans against employment of convicted felons in certain jobs did not impose punishment under Ex Post Facto Clause). Only a punitive measure can violate the Ex Post Facto Clause. See, e.g., Smith v. Doe, 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003); see also United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding preventative detention under the Bail Reform Act was permissible because it was regulatory and preventative, rather than punitive).
The Supreme Court has stated that felon disenfranchisement provisions are considered regulatory rather than punitive. In Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Court explained:
[A] statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.... The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.
Id. at 96-97, 78 S.Ct. 590; see also Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (criminal record is an “obvious” factor that “a State may take into consideration in determining the qualifications of voters”). Article 120 is no exception.
Even if the Supreme Court had not already described such regulation of the franchise with respect to incarcerated felons as nonpenal, we would still find Article 120 to be a civil regulatory scheme. In examining Article 120 “on its face,” Hudson v. United States, 522 U.S. 93, 100, 118 *44 S.Ct. 488, 139 L.Ed.2d 450 (1997), there is no language indicating the Commonwealth’s provision is penal. Article 120 is not in the Commonwealth’s criminal code, but rather its civil constitutional and statutory voter qualification provisions. See Hendricks, 521 U.S. at 361, 117 S.Ct. 2072, (“[The State’s] objective to create a civil proceeding is evidenced by its placement of the Act within the [State’s] probate code, instead of the criminal code” (citations omitted)). Article 120 also disenfranchises persons under guardianship, persons disqualified because of corrupt elections practices, and all persons under eighteen years of age, as well as incarcerated felons. And the disqualification is enforced civilly, not criminally.
Article 120 does not involve a more general period of disenfranchisement because of commission of a felony; rather Article 120 is limited to the period of incarceration. Article 120 thus creates a temporary qualification on the right to vote coincident with imprisonment, rather than a long-term consequence for the commission of a crime.
Article 120 is a constitutional amendment, which was later effectuated and extended by statute. The voters of Massachusetts ratified Article 120 in a statewide election. The Voter Guide read by the voters, which we described earlier, made no mention of any goal of punishing prisoners. “The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences.” Smith, 123 S.Ct. at 1153.
Secondly, even if the legislature intended to deem a particular law “civil,” courts must further inquire whether “the statutory scheme was so punitive either in purpose or effect as to negate that intention.” United States v. Ward, 448 U.S. 242, 248-49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). “ ‘[0]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.” Hudson, 522 U.S. at 100, 118 S.Ct. 488 (quoting Ward, 448 U.S. at 249, 100 S.Ct. 2636). Plaintiffs fail to meet this standard.
We review whether plaintiffs’ allegations of punitive purpose meet the non-exclusive factors test set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), and followed in Smith, 538 U.S. at 97, 123 S.Ct. 1140.
The Mendoza-Martinez factors are: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment — retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether there is a rational connection to a nonpunitive purpose; and (7) whether it appears excessive in relation to the alternative purpose assigned. Mendoza-Martinez, 372 U.S. at 168-69, 83 S.Ct. 554. The most relevant factors are whether felon disenfranchisement “has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.” Smith, 538 U.S. at 97, 123 S.Ct. 1140.
First, Article 120 does not impose any affirmative disability or restraint, physical or otherwise. See Smith, 538 U.S. at 100, 123 S.Ct. 1140 (“[Ijmprisonment ... is the paradigmatic affirmative disability or restraint.”). Disenfranchise *45 ment during the period of incarceration imposes no additional term of imprisonment, see Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), and is not as enduring as permanent occupational debarment, which the Court has held is nonpunitive. Hudson, 522 U.S. at 104, 118 S.Ct. 488; De Veau, 363 U.S. at 144, 80 S.Ct. 1146; Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revocation of a medical license does not violate Ex Post Facto clause).
Second, felon disenfranchisement has historically not been regarded as punitive in the United States, as the Supreme Court indicated in Trop v. Dulles. Indeed, in holding that felon disenfranchisement has “affirmative sanction” in § 2 of the Fourteenth Amendment of the U.S. Constitution, Richardson, 418 U.S. at 54, 94 S.Ct. 2655, the Supreme Court noted the historical prevalence of state felon disenfranchisement laws and never characterized even California’s broad disqualification of former felons as punitive. Id. at 55, 94 S.Ct. 2655.
As to the third and fifth factors, Article 120 is effective regardless of a finding of scienter or the type of crime so long as it is a felony. That Article 120 may be “tied to criminal activity” is “insufficient to render the statutfe] punitive.” United States v. Ursery, 518 U.S. 267, 291, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996).
The fourth Mendoza-Martinez factor considers whether felon disenfranchisement will promote the traditional aims of punishment, retribution and deterrence, to see whether plaintiffs have offered the clearest proof to overcome the statement of nonpenal purpose. Plaintiffs rely on some statements made by some legislators that could be viewed as retributive, such as that felons “don’t deserve to vote.” To the extent the legislators’ comments are relevant, they are sporadic and do not clearly evince a retributive purpose. More significantly, since Article 120 was put before the voters, the Information for Voters Guide is a better source of context. The Guide contained a balanced debate about the merits of allowing currently incarcerated felons to vote in state elections, noted the problem of prisoners being able to affect the laws under which they were confined by voting, and nowhere suggests an intent to punish prisoners.
As to the sixth factor, there is an obvious rational nonpunitive purpose for disenfranchisement: as the Guide shows, voters were concerned about the influence of currently incarcerated felons in “exercising] control over [their] lives by voting from prison.” See also Smith, 123 S.Ct. at 1147 (noting that “even if the objective of the Act is consistent with the purposes of the [state] criminal justice system, the State’s pursuit of it in a regulatory scheme does not make the objective punitive.”). Finally, Article 120 is not excessive in accomplishing this purpose. Article 120 does not violate the Ex Post Facto Clause.
IV.
The entry of judgment against the plaintiffs’ Ex Post Facto Clause claim is affirmed; the court’s denial of the motion to dismiss the VRA claim is reversed and the case is remanded to the district court for dismissal of both claims with prejudice. Each side shall bear its own costs.

So ordered.

. By “over-represented” the complaint referred to the representation of African-Americans and Hispanic-Americans in the prison population compared with their representation in the Massachusetts population at large, but gave no statistics.

. Vote dilution claims comprise the vast majority of § 2 claims. See E. Katz et al., Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982, 39 U. Mich. J.L. Reform 643, 650 (2005), available at http://sitema.ker. umich.edu/votingrights/files/finalreport.pdf;
D.P. Tokaji, The New Vote Denial: Where Election Reform Meets the Voting Rights Act, 57 S.C. L.Rev. 689, 709 (2006) ("[I]t is clear that the overwhelming majority of Section 2 lawsuits since 1982 have involved claims of vote dilution and not vote denial.”); see generally, Bartlett v. Strickland, — U.S. —, 129 S.Ct. 1231, 1240-41, 173 L.Ed.2d 173 (2009) (plurality opinion).

. The specific findings in the 1994 Commission Report, as stated in the pleadings, included that "racial minorities were underrepresented in jury pools selected from communities with large racial and ethnic populations; that Massachusetts courts are an unfriendly environment for people whose primary language is not English ...; and that minorities are underrepresented in [the] Massachusetts bar and bench.” The 1994 Report itself goes on to say, as to sentencing, that it lacked the necessary data to “test [the] hypothesis” that "[r]acial and ethnic bias may influence sentencing decisions.” The report did not conclude that any race bias resulted in minority defendants being sentenced as felons.

. Plaintiffs served interrogatories and document requests on defendant William Galvin, Secretary of the Commonwealth, seeking data as to the effect of Article 120 on minorities. For example, plaintiffs requested through interrogatories information on all individuals who have been arrested in Massachusetts since 1985 by name, date of birth, Social Security Number, race, ethnicity, skin color, and/or alleged offense. Defendant replied saying defendant did not maintain such records and had no responsive information.

. Despite the nomenclature of the defendant’s motion on the VRA § 2 claim as a motion for judgment on the pleadings, in fact both sides brought additional undisputed materials to the court’s attention. "In reviewing a motion [for judgment on the pleadings] under Rule 12(c) ... we may consider 'documents the authenticity of which are not disputed by the parties; ... documents central to plaintiffs’ claim; [and] documents sufficiently referred to in the complaint.’ ” Curran v. Cousins, 509 F.3d 36, 44 (1st Cir.2007) (alteration and omission in original) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993)).

. See Developments in the Law — One Person, No Vote: The Laws of Felon Disenfranchisement, 115 Harv. L.Rev.1939, 1942-49 (2002) (surveying state felon disenfranchisement statutes). This led the student law review note to comment: "The nation seems to be nearing a consensus that the presently incarcerated should not have the right to vote.” Id. at 1942.

. The SJC has also recognized that under Richardson states may disenfranchise felons. Dane v. Bd. of Registrars of Voters, 374 Mass. 152, 371 N.E.2d 1358, 1364 (1978) ("Disfranchisement of convicted criminals by State law was held by the ... Supreme Court in Richardson ... not to violate the equal protection clause.”).

. There are philosophical reasons as well, such as that those who violate the laws so seriously have removed themselves from the Lockean notion of the social contract:
The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man “authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due.” A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact.
Green, 380 F.2d at 451.

. In addition, plaintiffs contend § 2(a) must be read to be independent of § 2(b), which was added by the 1982 amendments. And even if § 2(b) is read as informing and restricting the meaning of § 2(a), plaintiffs submit, they have nonetheless stated a claim under the clear language of § 2(a).
Plaintiffs alternatively argue that, to the extent § 2(b) may be considered, it only establishes a totality of the circumstances test for proving a violation of § 2(a) and in no way limits the scope of § 2(a). Plaintiffs argue that, to the extent § 4 and § 5 (which ban certain practices) are relevant, those later sections demonstrate only that Congress meant § 2(a) to be read broadly. If legislative history is consulted, they argue that the legislative history of § 2 establishes that their claim falls within Congress's intent in enacting § 2.

. There are questions as to whether a claim of disparate impact is sufficient to state a § 2 vote denial case. See Johnson, 405 F.3d at 1235-37 (Tjoflat, J., concurring); see also Goosby v. Town Bd. of Hempstead, 180 F.3d 476, 499 (2d Cir.1999) (Leval, J., concurring); Nipper v. Smith, 39 F.3d 1494, 1524-25 (11th Cir.1994) (en banc); LULAC v. Clements, 999 F.2d 831, 859-63 (5th Cir.1993) (en banc). Whether a claim of mere disproportionality alone supports a “resulting” claim is not clear under § 2 and is a difficult question we need not reach.

. Indeed, in re-admitting southern states to the Union following the Civil War, Congress approved new state constitutions containing felon disenfranchisement provisions. Richardson, 418 U.S. at 48-52, 94 S.Ct. 2655.

. Plaintiffs rely heavily on the Court’s statement, in a vote dilution case, that Congress intended "to give the Act the broadest possible scope,” Allen v. State Bd. of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (interpreting the phrase "qualification ... or procedure” in § 2(a)). This language in Allen must be understood in light of the Court’s other statements in subsequent cases, including Bolden and Bartlett.

. The 1965 legislative history indicates that Congress focused much more attention on the import of § 4 and § 5 than on § 2 of the VRA.

. Congress continued to revisit the discriminatory tests or devices banned by § 4. Later VRA amendments extended the § 4 ban on literacy tests nationwide. See Voting Rights Act Amendments of 1970, Pub.L. No. 91-285, § 201, 84 Stat. 314, 315 (current version at 42 U.S.C. § 1973aa) (extending temporary ban to entire nation); Voting Rights Act Amendments of 1975, Pub.L. No. 94-73, § 201, 89 Stat. 400, 400-01 (current version at 42 U.S.C. §§ 1973b-1973c) (making the temporary nationwide ban permanent). Congress never changed its view that felon disenfranchisement laws were not within the reach of the VRA.

. The 1975 Amendments to the VRA added protections for linguistic minorities and permanently banned literacy tests. 1975 Amendments §§ 203, 207, 89 Stat. at 401-02 (codified as amended at 42 U.S.C. §§ 1973b(£), 19731(c)(3)). Nothing in those amendments indicated any intent to broaden the VRA to permit suits against state laws disenfranchising incarcerated felons.

. The proposed amendment would have authorized "the Attorney General ... to institute in the name of the United States such actions against States ... including actions for injunctive relief, as he may determine to be necessary to implement the purposes of this title.” Ex-Offenders Voting Rights: Hearing on H.R. 9020, supra, at 4 (quoting H.R. 9020, 93d Cong. (1973)).

. Under Supreme Court and circuit precedent, we read both § 2(a) and § 2(b) together and resort to legislative history. The text of § 2(b) is explicit that its purpose is to give content and context to the terms used in § 2(a). The Supreme Court has interpreted both sections together. See Bartlett, 129 S.Ct. at 1241 (“The 1982 amendments ... added ... § 2(b), providing a test for determining whether a § 2 violation has occurred.”); Chisom, 501 U.S. at 395, 111 S.Ct. 2354 (“The two purposes of the amendment [to § 2] are apparent from its text. Section (a) adopts a results test.... Section (b) provides guidance about how the results test is to be applied.”).
This court’s precedent also requires we read §§ 2(a) and 2(b) together and in light of history and context. See Metts, 363 F.3d at 10 ("The Delphic language of the [1982] amendment [to § 2] can be understood only against the background of its legislative history and subsequent Supreme Court interpretation.”).

. The context of the 1982 amendments confirms our understanding that § 2 was not amended in isolation from the rest of the statute and must be read in conjunction with the other sections, including § 4. The 1982 amendments to § 2 arose in the wake of Bolden because § 5 of the VRA was scheduled for reauthorization in that year by the terms of the 1975 VRA amendments. S. Issacharoff et al., The Law of Democracy 713-14 (rev.2d ed.2002). Indeed, in the House, most debate focused on the structure of the preclearance and bailout provisions of the VRA, while less attention focused on the § 2 amendments. Id. at 716; see also T.M. Boyd & S.J. Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L.Rev. 1347 (1983).

. Congress was clear about its intent. The Senate Report states:
This Amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2. It thereby restores the legal standards, based on the controlling Supreme Court precedents, which applied in voting discrimination claims prior to the litigation involved in Mobile v. Bolden. The amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test by codifying the leading pre-Bolden vote dilution case, White v. Re *40 gester. See S.Rep. No. 97-417, at 2, reprinted in 1982 U.S.C.C.A.N. 177, 179; see also id. at 27, reprinted in 1982 U.S.C.C.A.N. at 205 ("The 'results' standard is meant to restore the pre-Mobile legal standard which governed [vote dilution cases].”).

. The Bolden plurality also held that the "language of § 2 [of the VRA] no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself.” 446 U.S. at 61, 100 S.Ct. 1490.

. We need not reach the question of whether this amendment was meant to reach other types of § 2 claims than vote dilution claims; even if so, the amendments were not meant to create a cause of action against imprisoned felon disenfranchisement laws.

. The Civic Participation and Rehabilitation Act would have restored the voting rights of ex-felons, but not imprisoned felons, in federal elections. H.R. 906 was not drafted as an amendment to the VRA, but contained a savings clause clarifying that the measure operated in addition the VRA and the National Voter Registration Act. Civic Participation and Rehabilitation Act of 1999: Hearing on H.R. 906, supra, at 4. A number of recent unsuccessful bills are consistent with H.R. 906’s proposal to restore the rights of only former felons. And even these have been flatly rejected by Congress. See, e.g., Democracy Restoration Act of 2008, S. 3640, 110th Cong. (2008); Democracy Restoration Act of 2008, H.R. 7136, 110th Cong. (2008); Count Every Vote Act of 2005, S. 450, 109th Cong. (2005); Ex-Offenders Voting Rights Act of 2005, H.R. 663, 109th Cong. (2005).

. It is doubtful plaintiffs have articulated a viable § 2 direct denial theory, in any event. Plaintiffs have explained only that they think this claim falls within a broad reading of § 2, provided one ignores the text of § 4, the legislative history of the Act, and the purpose and *42 context of § 2(b). But they have not explained even what their theory of liability is, what standards a court would apply, or what the components of a winning claim would be. This is the situation eight years after they filed suit and have had discovery from defendants.
The most plaintiffs have suggested is that despite the self-evident racial neutrality of depriving all incarcerated felons from voting while imprisoned, there may be some causal connection between being incarcerated for felonies and their race. But the very 1994 Commission Report on which they rely concludes that no such connection was shown. More than that, it concluded that if one wished to see if such a connection could be shown, the data simply did not exist to permit the testing of the hypothesis. When plaintiffs asked the defendant officials in discovery for data which would presumably assist them, the defendants said they did not have and did not keep such data.
There is nothing else. Even if one were to look more broadly at the Senate factors so often used in vote dilution cases, see S.Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07, those factors do not aid plaintiffs.
Further, given our disposition of the case, we need not reach the concerns raised by Judge Kozinski about the role of evidence of statistical disparities in § 2 challenges. Farrakhan, 359 F.3d at 1119 (Kozinski, J. dissenting from denial of reh’g en banc); see also Ricci v. DeStefano, - U.S. -, 129 S.Ct. 2658, 2678, 174 L.Ed.2d 490 (2009) (reliance on threshold showing of a raw statistical disparity in test results is not strong evidence of disparate impact).

. Some have commented on a "potential tension in the case law [because] ... section 2 [from 1982 onward] had been used almost entirely for vote dilution claims [while] [t]he felon disenfranchisement cases involve an older kind of claim involving access to the ballot itself; such cases involve not vote dilution but vote denial.” S. Issacharoff et al., The Law of Democracy 140 (rev.2d ed. Supp. 2006); see Tokaji, supra, at 709 ("While Gingles and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge .... [and] the Supreme Court's seminal opinion in Gingles ... is of little use in vote denial cases.”); Karlan, supra, at 122 (["T]he second generation of voting rights activity address the problem of racial vote dilution rather than outright disenfranchisement.”); A.A. Peacock, From Beer to Eternity, in Redistricting in the New Millennium 119, 125 (P.F. Galderisi ed., 2005) 119, 125 (same).